REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 142

September Term, 2013

WILLIAM R. KYLER

v.

STATE OF MARYLAND

Krauser, C.J.,
Graeff,
Hotten,

JJ.

Opinion by Graeff, J.

Filed: July 31, 2014

A jury sitting in the Circuit Court for Calvert County convicted appellant, William Kyler, of two counts of being a drug kingpin, one count of possession with intent to distribute more than 448 grams of cocaine, one count of possession with intent to distribute more than 50 grams of cocaine base, one count of possession of cocaine with intent to distribute, one count of possession of cocaine base with intent to distribute, one count of concealing the proceeds of a controlled dangerous substance ("CDS") offense, and one count of conspiracy to distribute cocaine. The court sentenced appellant to a term of imprisonment totaling 65 years.[1]

On appeal, appellant presents three questions for our review, which we have rephrased slightly as follows:

1.  Did the circuit court abuse its discretion and violate appellant's Sixth Amendment right to a public trial by closing the courtroom during the testimony of five undercover police officers?

2.  Was the evidence sufficient to support appellant's drug kingpin convictions?

3.  Did the circuit court err in imposing separate sentences for the convictions of volume dealing and possession with intent to distribute?

For the reasons set forth below, we agree with appellant that his convictions for volume dealing merge, for sentencing purposes, with the convictions for possession with

---

[1] The court sentenced appellant to 20 years for the one drug kingpin conviction, 25 years, consecutive, for the conviction of possession with intent to distribute cocaine, and 20 years, consecutive, for the conviction of possession with intent to distribute cocaine base. It merged the other drug kingpin conviction and the conspiracy conviction for sentencing purposes and imposed concurrent sentences on the remaining convictions.

intent to distribute. Accordingly, we shall vacate the volume dealing sentences. Otherwise, we shall affirm the judgments of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

Detectives in the Calvert County Sheriff's Department, who worked undercover in the Drug Enforcement Unit, began investigating appellant in the summer of 2010.[2] They conducted surveillance of appellant and used confidential informants to assist in investigating appellant's drug activity.

Detective B. conducted several controlled buys from appellant with the assistance of an informant. Detective B. observed the informant purchase narcotics from appellant, and the informant would then give the narcotics to Detective B. The informant purchased narcotics from appellant at various locations: appellant's residence; the King office building (the "King Building"), where appellant's business, Kyler Photo Inc., was located; a barbershop; and a wireless telephone store, adjacent to the barbershop.

Detective B. observed appellant engage in other hand-to-hand drug transactions between July and September 2010. One such transaction occurred behind the King building, where appellant received money from an individual in exchange for what Detective B. believed, based on his training and experience, to be narcotics.

---

[2] In order to protect the identity of the undercover officers, we will refer to them using only their initials.

Detective B. also observed what he believed to be hand-to-hand drug transactions arising from the barbershop. In one transaction, an unknown male exited the barbershop, walked across the street to a gas station, and placed an item on a cooler, at which time a woman walked to the cooler, placed money there, and walked away. The unknown male then took the money and returned to the barbershop.

On several other occasions, Detective B. observed individuals pull in front of the barbershop, exit their vehicles, and go into the barbershop for such a short period of time that it was "impossible for them to get a haircut." At times, the visitors to the barbershop spent more time looking for a parking space than they spent inside the shop. Although the barbershop offered only men's haircuts, women were seen entering the shop alone and leaving several minutes later. Detective B. recognized several of the individuals he observed entering and quickly leaving the shop from prior CDS cases. Based on the visitor traffic at the shop, including the cars pulling in front of the shop and the drivers entering only briefly, Detective B. believed that the activity he witnessed was consistent with illegal drug activity.

Detective B. saw appellant at the barbershop on approximately 20 occasions during his investigation. Appellant often visited the shop following days when there was a lull in activity. After his visit, however, traffic would pick up again. Appellant typically was inside the shop for approximately 30 minutes, although he stayed for one to two hours during several visits. Sometimes, he would enter and leave the shop carrying a gym bag or a suitcase.

Detective B. also observed activity that was consistent with illegal drug transactions at the wireless telephone store owned by appellant. After customers entered the wireless shop, they left without a bag, cell phone, or any other merchandise one would expect to be sold at a wireless store. The shop itself did not contain any cell phone or cell phone related merchandise; the only merchandise in the shop was clothing.

Corporal P. assisted with the investigation. He conducted surveillance of appellant's activities at the King building, where the photo shop was located in Suite 220. The exterior of the shop consisted of a door with the numbers 2-2-0 on the outside; there was no indication that the business was a photo shop. Corporal P. never observed appellant enter or leave the shop with photography equipment.

On October 14, 2010, four months after his investigation began, Corporal P. executed a search warrant for the photo shop, where he found evidence of drug dealing. Inside a locked, navy blue suitcase, Corporal P. found a large quantity of suspected cocaine and suspected crack cocaine, "several items used in the process to convert cocaine into crack cocaine," a digital scale, and $14,000.[3] Corporal P. also found materials in the premises used to package cocaine and crack cocaine, as well as a candle, a hotplate, a mixer, and pyrex measuring glasses with a charred white residue. The police also found a lease agreement for the space in which the barbershop and wireless store were located.

_____

[3] The items used to convert cocaine to crack cocaine included nail polish remover, a bottle of Inositol, and boxes of baking soda.

Appellant was present during the search of the photo shop. His person was searched, and the police recovered money, more than 10 grams of suspected crack cocaine, and "independence cards" issued to individuals other than appellant.[4] Corporal P. testified that these cards often are used by people to pay for drugs.

Greg Crump, a crime scene technician, analyzed the contents of the suitcase seized. He obtained from one of the measuring cups Corporal P. seized from the photo shop one latent fingerprint, which he sent to the Charles County crime lab. Earnest Jones, a fingerprint specialist with the Charles County Sheriff's Office, testified that the print on the measuring cup was from appellant's left middle finger.[5]

Detective B. also obtained a search warrant for the barbershop and wireless store. No items indicative of a functioning business, such as a cash register or a receipt book, were found. The police did find receipts for phones, cell phone equipment inside of a locked filing cabinet, and a sports bag with cell phones inside.

Detective J. executed a search warrant for appellant's home. He seized a money counter from the closet of the master bedroom, as well as 37 cell phones and two memory cards. He did not find any cameras, photo paper, or other photo printing supplies.

---

[4] The term "independence card" refers to a debit card where public assistance funds, such as food stamps, are deposited on a monthly basis.

[5] The parties stipulated that Jeffery Merchant, a member of the Charles County crime lab, would have testified that he previously had obtained appellant's prints, and those fingerprints were given to Mr. Jones for comparison.

Detective B. believed that appellant might have a storage unit because "drug dealers often hide currency" or "evidence of illegal activity" in storage units. He sent subpoenas to all the area storage facilities and learned that appellant leased a storage unit less than an eighth of a mile from the barbershop, on Calvert Beach Road.

Corporal P. obtained and executed a search warrant for the storage unit. He found appellant's personal belongings, as well as documents with appellant's and Cranston Brown's names on them, including documents identifying appellant as Mr. Brown's employer.[6]

On October 21, 2010, in response to a tip, Corporal P. obtained a search warrant for an additional storage unit leased by appellant. That storage unit contained a dresser, which contained a black "laptop style carrying case" with $91,000 in cash and a piece of paper with numbers written on it. Detective G., who had conducted surveillance of appellant at the barbershop, identified the black laptop bag as the same bag that she had seen appellant carry into and out of the barbershop on at least one occasion.

During the course of the investigation, Detective B. connected two other men to the activities at the barbershop, Antoine Savoy and Roosevelt Brooks. Mr. Savoy rented the

_____

[6] Mr. Brown was incarcerated at the time of trial. Prior to his arrest in 2008, he had been residing with appellant. He was in jail for his conviction for possession of cocaine with intent to distribute, based on cocaine that was found inside a safe in his closet at appellant's home. Mr. Brown ultimately pled guilty to the charge, although he initially told police investigators that the safe was there when he moved into appellant's residence. Certified records from the Division of Corrections indicated that appellant visited Mr. Brown in jail, and appellant deposited substantial funds into Mr. Brown's commissary account.

building in which the barbershop was located, and Mr. Brooks frequented the shop every few days.

In one controlled-buy, an undercover police detective, Detective T., arranged to purchase crack cocaine from Mr. Brooks. He went to Mr. Brooks's front yard, and Mr. Brooks told him that he "had to wait for his man to show up." Mr. Brooks received a phone call, and a few minutes later, a black Mercedes pulled in front of the house. Mr. Brooks got into the vehicle, and the vehicle drove around the block. Detective B. recognized the car as one he had seen Mr. Savoy drive to and from the barbershop, and Detective T. recognized Mr. Savoy as the driver. Mr. Brooks then exited the Mercedes and sold Detective T. cocaine.

Detective G. applied for, and received, a search warrant for Mr. Brooks's home. During the search, she found a copy of the search warrant that was executed at appellant's house.

Sergeant Matthew McDonough, a member of the Calvert County Sheriff's Office, testified as an expert in the field of CDS investigations. His expertise included methods of distribution and trafficking, CDS distribution organizations, packaging, use and value of CDS and paraphernalia, and circumstances indicative of CDS distribution and/or an intent to distribute CDS.

Sergeant McDonough explained the significance of the evidence found. Five packages recovered from the photo shop appeared to contain cocaine in its powder form, and

one package contained cocaine that had "been converted back into its base form, which is known as crack." The packing of the cocaine and crack indicated that they would each be sold for $150 to $200. Other packages of cocaine found at the photo shop, which were packaged in much larger, quarter kilo amounts, indicated that the dealer had staff to whom he would give the quarter kilos to sell.

Other items found in the photo shop were related to drug dealing. The hotplate and baking soda found in the suitcase in the office could be used to convert powder cocaine into crack cocaine. Acetone, a component of the nail polish remover, is used to wash cocaine, i.e., to dissolve the materials used in diluting the cocaine during the process of converting the cocaine to crack. Inositol is used to dilute cocaine to increase profits to dealers.

The independence cards in other people's names, found on appellant's person, were also indicative of drug dealing activity. Sergeant McDonough explained that it is "fairly common" for people who do not have cash to purchase drugs with the funds on their independence cards by giving their cards to the dealer.

Sergeant McDonough stated that the large amount of money recovered from the laptop bag in the storage unit, $91,000, as well as the "substantial amount of cocaine," indicated that appellant had sold a portion of an even larger amount of cocaine and was in the process of selling the remaining portion. He opined that the piece of paper that was found with the money appeared to be a ledger, where appellant kept track of money going in and out.

With respect to appellant's visits to Mr. Brown, and his deposits into Mr. Brown's commissary accounts, Sergeant McDonough stated: "If a person is a standup person, does not give information to law enforcement and goes ahead and eats the charge or takes the arrest and goes to jail," then "the individual(s) who did not get charged will sometimes help out that person by putting money into their commissaries."

Evidence that appellant had spent over $18,000 on rental cars over the course of 18 months was also significant to Sergeant McDonough. He explained that drug traffickers often drive different vehicles to avoid police surveillance and avoid having their personal vehicle forfeited in the event that they get caught. Drug traffickers also tend to avoid keeping any funds in a bank as an additional measure to avoid police detection. Based on the testimony and evidence presented against appellant, Sergeant McDonough opined that appellant was a mid-to-high level drug dealer.

After the State rested its case, appellant moved for judgment of acquittal. With respect to the drug kingpin charges, counsel argued that there was insufficient evidence to establish that appellant was "an organizer, supervisor, financier, or manager" of a drug distribution network. The State disagreed, arguing that there was evidence from which the jury could draw inferences that appellant was "in a position of a supervisor, manager, organizer, [or] financier" of a drug conspiracy. The court denied appellant's motion.

Appellant then called John Boome, his cousin, who testified that appellant worked as a photographer, taking photos at events and parties. Beginning in 2006 or 2007, Mr. Boome

worked, when he was available, as appellant's photography assistant, helping him photograph events on the weekends. Mr. Boome went with appellant to events, including night clubs, and accepted payments for appellant's services, which typically cost $700 or $800 for adult events, and $70 or $80 for children's parties. All of the payments for appellant's photography services were made in cash. Mr. Boome testified that appellant possessed "all kinds" of photography equipment, including tripods, printers, and several cameras. The last event with which Mr. Boome helped occurred in August 2010.

Shemeka Cole, an event organizer, hired appellant from 2002 to 2008 to take photos at events. After she stopped working with appellant, she would still see him at events taking photographs. Appellant was always paid for his services in cash. April Harrod, appellant's ex-girlfriend, testified that appellant had a photography business called Flick It Up Photo.

After the defense rested, the State moved into evidence several exhibits, including appellant's bank records, as well as a certificate from the Custodian of Records with the Comptroller of Maryland, which indicated that appellant had not paid income taxes in 2010.[7] Appellant then renewed his motion for judgment of acquittal, which the court denied.

---

[7] Bank records from PNC Bank were for appellant, doing business as "B & K Multi Services," and bank records from M&T Bank contained transactions by appellant, as well as Kyler Inc. The State sought to introduce the records to rebut testimony implying that the large amounts of cash found in appellant's possession could be explained as proceeds from his photography business. In closing, the State argued as follows: "You'll see in [appellant's] bank records. . . . the amounts of deposits he makes and all of the expenditures he has." The State asserted that, relative to the large amounts of money found in his storage unit and suitcase, "it does not add up."

As indicated, the jury found appellant guilty of multiple drug charges. This timely appeal followed.

## DISCUSSION

### I.

### Right to a Public Trial

Appellant contends that the circuit court "abused its discretion and violated [his] Sixth Amendment right to a public trial" when it closed "the courtroom to the public during the testimony of five undercover officers based solely on a general proffer from the State, without making the requisite case-specific findings of fact to support an 'overriding interest' that would justify the closure." He asserts that the denial of the constitutional right to a public trial is a structural defect, and therefore, we must remand his case for a new trial.

The State argues that appellant's contention is not preserved for this Court's review, noting that appellant did not object to the State's request to screen the officers from view or the court's proposed solution to close the courtroom during the testimony of the five officers. It asserts that appellant's "failure to make any noise about the State's request and the trial court's subsequent ruling invited any error that may have arisen as it negated the State's need for a more extensive proffer or the circuit court's need for more specialized findings." In any event, the State contends that the court acted "within its discretion in allowing for the limited closure of the courtroom while instituting other accommodations for public consumption of

-11-

the trial in order to protect the identities of undercover police officers during their testimony."

## A.

### Proceedings Below

At the start of appellant's trial, the State expressed its concern regarding "undercover officers who remain assigned in an undercover capacity" being required to testify in "the open courtroom with their faces displayed to individuals who may be here watching the trial." The State requested that the court allow the officers to "testify from the side of the courtroom close to the jury box, screened from view of the gallery, and that precautions be made to close those portions of the courtroom that would allow them to be seen [by] individuals seated in the gallery of the courtroom." The State further requested that the court allow the officers to wear masks when they entered the courtroom, to block the view from the gallery, and then remove the masks when they were behind the screened area.

The court asked for input from appellant's counsel, and counsel replied that it would have "a chilling effect in terms of giving [appellant] a fair trial." The following colloquy then occurred:

> THE COURT: The other alternative is we can clear the courtroom when they come in and then leave the screen up. For officer safety I think we need to have some accommodation for that.
>
> [DEFENSE COUNSEL]: Perhaps if that can be done in such a way that's not obvious to the jury. I wouldn't have a problem with that.

-12-

The court stated that there were two options it could use to protect the identity of the officers: "Keep the witness in the witness stand but clear the courtroom or have the witness testify over closest to the jury." The State clarified that either procedure would need to be employed for five witnesses, each of whom was an undercover police officer. At that point, appellant's counsel stated: "I would ask the court to clear the courtroom if that's the choice." He then went on to elaborate on his election:

> And again, I think given the choice, given those two choices from the defense's point of view, it's probably best to have all witnesses testify. It doesn't suggest that one witness maybe has greater importance than another. It might be a chilling effect. I don't think these jurors – I think they're highly intelligent, and I think that they will perhaps view those precautions in a way that's suggestive that my client poses somehow a danger. They might misunderstand or misconstrue the purpose, and I think for those reasons, if the court's going to recognize these concerns from the [S]tate, best to have the witness testify here and we'll clear the courtroom.

The State then expressed concern about appellant's " right to have a public trial," stating: "I don't want there to be an issue with respect to the lack of a public trial if certain witnesses are testifying without the public being permitted to observe." The State explained, however, that "we live in a small county and we have only so large a pool of officers to work in an undercover capacity," and as "[t]hey continue in that assignment," their testimony raises "an officer safety issue."

The court then suggested, as a way to accommodate the parties' concerns regarding officer safety and appellant's right to a public trial, that the courtroom could be closed, but individuals who wanted to listen to the testimony could do so by listening to recorded trial

-13-

proceedings in another room. It believed that would resolve defense counsel's concern regarding "perhaps highlighting those witnesses to the jury panel" by having them testify behind a screen. The court stated that interested individuals could "listen in to the trial and then they can come back and observe. So I think we've solved both problems." Appellant's counsel voiced no objection to that arrangement.

After speaking to the court administrator regarding setting up a listening room, the court then made the following findings, noting again its view that the proposed arrangement "solves all concerns":

> The court certainly makes an affirmative finding that we do live in a small community. Four or five of these witnesses are still working in an undercover capacity. It is a small community. For officer safety I think we need to make some accommodation for their safety as well as make an accommodation for a public trial for the defendant.
>
> So the witnesses – the observers will be able to listen to the testimony but not see the witnesses. And I do think [defense counsel's] comments of highlighting the witnesses either if they came in masked and sat behind a screen might highlight their testimony. So I think our jury . . . . will not realize that there's no one in the courtroom because there will be a rule on witnesses. So if anyone is going to be a witness, they wouldn't be allowed in the courtroom anyway. And then all of the witnesses will testify in the courtroom in the same spot.

Appellant's counsel again voiced no objection.

The courtroom was closed during the testimony of the five undercover officers, and during that time, members of the public were allowed to listen to the testimony in another courtroom. The courtroom otherwise was open during trial for public viewing.[8]

## B.

## Waiver

We first address the State's preservation argument. Pursuant to Maryland Rule 8-131(a), an appellate court ordinarily "will not decide any . . . issue unless it plainly appears by the record to have been raised in or decided by the trial court." The rationale for "the rule limiting the scope of appellate review to those issues and arguments raised in the court below 'is a matter of basic fairness to the trial court and to opposing counsel, as well as being fundamental to the proper administration of justice.'" *In re: Kaleb K.*, 390 Md. 502, 513 (2006) (quoting *Medley v. State*, 52 Md. App. 225, 231 (1982)).

In *Robinson v. State*, 410 Md. 91, 110 (2009), the Court of Appeals held, "[c]onsistent with the vast majority of the courts that have spoken on the subject," that "a claimed violation of the right to a public trial must be preserved for appellate review by a timely objection at trial." The Court stated that, although an appellate court has discretion to review an unpreserved claim of error, it should do so "'only when it is clear that it will not work an

_____

[8] After opening statements, the court made the following announcement: "So if there are any spectators that wish to listen to the testimony in the State of Maryland versus [appellant], if you would go through this gate and follow the gentleman in the yellow shirt and tie."

unfair prejudice to the parties or to the court.'" *Id*. at 104 (quoting *Jones v. State*, 379 Md. 704, 714 (2004)). Unfair prejudice may result for several reasons, including "when counsel fails to bring the position of [his or] her client to the attention of the trial court so 'that court can pass upon and correct any errors in its own proceedings.'" *Id*. (quoting *Jones*, 379 Md. at 714). Noting that "the very analysis Appellant complains was not done by the trial court likely would have been done had he brought the matter to the court's attention," the Court declined to exercise its discretion under Maryland Rule 8-131(a) to address Robinson's unpreserved claim that the court erred in excluding Robinson's family from trial. *Id*. at 105. It held that, under the circumstances, "it would be unfair to the court and prejudicial to the State to review [Mr. Robinson's] unpreserved claim of error." *Id*.

The analysis in *Robinson* informs our decision in the present case. Here, although defense counsel expressed concern with the State's suggestion of erecting a screen to protect the identities of undercover police officers, stating that it might have "a chilling effect," defense counsel voiced no objection to the procedures employed by the court. Indeed, when the court suggested clearing the courtroom and setting up an alternate listening site for members of the public during the testimony of the officers, defense counsel stated that he "wouldn't have a problem with that" if it was "done in such a way that's not obvious to the jury."

The State, not appellant, then addressed whether such an arrangement would implicate appellant's right to a public trial. After considering the State's concerns, as well as

-16-

appellant's concerns about highlighting the testimony of the undercover officers, the court proposed a solution that would protect officer safety and address defense counsel's concern. Again, appellant voiced no objection to the court's proposal.

Under these circumstances, it is clear that appellant's argument on appeal, that the alternative procedure employed by the court violated his constitutional right to a public trial, was not presented to the circuit court. We hold, as the Court of Appeals did in *Robinson*, 410 Md. at 105, that it "would be unfair to the court and prejudicial to the State to review [appellant's] unpreserved claim of error."

## II.

## Drug Kingpin

Appellant next argues that the evidence was insufficient to support his drug kingpin conviction. He contends that "[t]here was no evidence at trial from which a rational trier of fact could conclude beyond a reasonable doubt that [he] organized, supervised, financed or managed Antoine Savoy, Roosevelt Brooks, or Cranston Brown in a drug conspiracy," and without such evidence, the State failed to establish the requisite elements of his drug kingpin status.

The State disagrees. It argues that the evidence was sufficient to establish appellant's role as a drug kingpin, asserting that the evidence permitted the jury to find that appellant "oversaw the entire drug enterprise." The State contends that the evidence supported a finding that appellant's "role was that of directing, managing, and supervising the drug

conspiracy, which included a number of players," including Mr. Savoy, Mr. Brooks, and Mr. Brown.

This Court recently set forth the applicable standard of review in determining the sufficiency of the evidence on appeal:

> The test of appellate review of evidentiary sufficiency is whether, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Coleman*, 423 Md. 666, 672 (2011) (quoting *Facon v. State*, 375 Md. 435, 454 (2003)). The Court's concern is not whether the verdict is in accord with what appears to be the weight of the evidence, "but rather is only with whether the verdicts were supported with sufficient evidence -- that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt." *State v. Albrecht*, 336 Md. 475, 479 (1994). "We 'must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.'" *Cox v. State*, 421 Md. 630, 657 (2011) (quoting *Bible v. State*, 411 Md. 138, 156 (2009)). Further, we do not "'distinguish between circumstantial and direct evidence because [a] conviction may be sustained on the basis of a single strand of direct evidence or successive links of circumstantial evidence.'" *Montgomery v. State*, 206 Md. App. 357, 385 (quoting *Morris v. State*, 192 Md. App. 1, 31 (2010)), *cert. denied*, 429 Md. 83 (2012).

*Donati v. State*, 215 Md. App. 686, 716, *cert. denied*, 438 Md. 143 (2014).

Maryland Code (2012 Repl. Vol.) § 5-613(a) of the Criminal Law Article ("CL") defines a "drug kingpin" as "an organizer, supervisor, financier, or manager who acts as a coconspirator in a conspiracy to manufacture, distribute, dispense, transport in, or bring into the State a controlled dangerous substance." When a drug kingpin "conspires to manufacture, distribute, dispense, transport in, or bring into the State," a CDS in an amount

listed in CL § 5-612 (which for purposes of this case includes 448 or more grams of cocaine or 50 or more grams of "crack"), he or she is subject to a mandatory minimum sentence of 20 years, without the possibility of parole.  CL § 5-613(b)(1).[9]

The Maryland appellate courts have addressed the drug kingpin statute on several occasions.  In *Williams v. State*, 329 Md. 1, 14 (1992), the Court of Appeals applied well-settled rules of statutory interpretation in determining the meaning of the statute.  Noting that the "'cardinal rule of statutory construction is to ascertain and effectuate legislative intent,'" *id.* at 15 (quoting *State v. Bricker*, 321 Md. 86, 92 (1990)), the Court looked to the terms "organizer," "supervisor," "financier," and "manager" and determined that they are "common words with well understood meanings." *Id*. at 11.  The Court explained:

> As these words are defined by Webster's Third New International Dictionary (1981), an "organizer" is "one who organizes" (to "organize" is "to unify into a coordinated functioning whole; ... to arrange by systematic planning and coordination of individual effort").  A "supervisor" is "one that supervises a person, group, department, organization, or operation" ("supervise" is "to ... oversee with the powers of direction and decision the implementation of one's own or another's intentions").  A "financier" is "a large scale investor."  A "manager" is "one that manages, a person that conducts, directs, or supervises something."

*Id*.[10]

---

[9] Md. Code (2012 Repl. Vol.) § 5-613(d) provides: "(d) *Merger.* — Notwithstanding any other provision of this title, a conviction under this section does not merge with the conviction for any crime that is the object of the conspiracy."

[10] Other courts similarly have defined these terms.  *See U.S. v. Hutching*, 75 F.3d 1453, 1458 (10th Cir. 1996) ("'An organizer arranges a number of people engaged in separate activities into an essentially orderly operation,' and a supervisor gives orders or directions to another person who carries them out.") (quoting *U.S. v. Smith*, 24 F.3d 1230,

The Court noted, however, that although there were plain meanings for the terms, "[u]ndeniably . . . some ambiguity creeps into the statutory terms at the margins." *Id*. at 16. Accordingly, the Court looked to the "larger context of the statute and to other relevant materials to ascertain legislative intent." *Id*. at 16. *Accord Morse v. Erie Ins. Exch.*, 217 Md. App. 1, 34 (2014) ("When the text is ambiguous, we must look beyond the statute's plain language to determine legislative intent. . . . 'The Court will look at the larger context, including the legislative purpose, within which statutory language appears.'") (quoting *Consol. Constr. Servs., Inc. v. Simpson*, 372 Md. 434, 457 (2002)).

After conducting this legislative review, the Court stated:

> It is plain to us that the phrase "drug kingpin" was intended by the legislature to apply to a leader of a drug trafficking network. It thus follows that the words "organizer," "supervisor," "financier," and "manager," read in the context of the statute, were not intended to encompass a person occupying a role substantially less than that of a large-scale drug trafficker. In other words, in looking to the larger context of the statute (which prescribes lesser penalties for non-kingpins); at the bill's title; and at external evidence in order to chart the blurry perimeters of the statute's operative terms, we believe that the legislature intended the statute's heightened penalties for "drug kingpins," or leaders, to have limited application to those acting as organizers, supervisors, financiers, or managers of large-scale drug trafficking operations.

*Id*. at 17.

---

1233 (10th Cir. 1994)); *State v. Alexander*, 643 A.2d 996, 1002 (N.J. 1994) (in jury instructions a court "might define an 'organizer' as a person who arranges, devises, or plans a drug-trafficking network; a 'supervisor' as one who oversees the operation of a drug-trafficking network; a 'financier' as one who is responsible for providing the funds or resources necessary to operate a drug-trafficking network; and a 'manager' as one who directs the operations of a drug-trafficking network").

In *Williams*, the Court summarized Mr. Williams' limited role in the drug conspiracy as follows:

> (1)[] agreeing to and transporting the drugs . . . to Salisbury; (2) negotiating the final purchase price of $34,000; (3) engaging a driver to transport him and the drugs to Salisbury; (4) receiving and counting the . . . money; (5) secreting that money in his car; and (6) advising [the undercover officer] that he could be directly contacted for further sales.

*Id.* at 20. Although the evidence indicated that Mr. Williams was "an important cog" in effectuating a large drug transaction, and he was "more than a 'mule' or mere courier of the drugs," the Court held that the evidence did not permit a rational fact finder to conclude, beyond a reasonable doubt, that Mr. Williams' "participation amounted to that of an organizer, a supervisor, or manager within the contemplation of the statute." *Id*.

In two cases decided by this Court, however, we held that there was sufficient evidence to allow the jury to determine that the respective defendants acted as drug kingpins. In *Allen v. State*, 89 Md. App. 25, 52 (1991), *cert. denied*, 325 Md. 396 (1992), this Court held that the evidence sufficiently demonstrated that Allen was more than just a co-conspirator; he was an organizer, manager, and supervisor, in addition to serving as a financier. The State "presented witnesses who testified that they participated in the narcotics operation under Peter Allen's supervision." *Id.* at 52. There was evidence that Mr. Allen paid his sister-in-law to transport money for him, that another witness used to sell drugs for him, and that Mr. Allen would supply that witness with drugs to sell. *Id*. at 52-53. We determined that the latter evidence, along with tapes played at trial of Mr. Allen organizing

the times, locations, and prices of drugs to be sold, established that Mr. Allen "was a leader of a drug operation, rather than a mere player with no greater authority than the others." *Id.* at 53. Accordingly, we held that "[t]here was clearly sufficient evidence for the jury to find that Peter Allen was, indeed, a 'drug kingpin.'" *Id*. at 53.

Similarly, in *Velez v. State*, 106 Md. App. 194, 203 (1995), we addressed whether there was sufficient evidence to find that Isabel Velez acted as a drug kingpin in a family drug operation. In that case, there was evidence that Ms. Velez "supervised and orchestrated" the family's drug transactions, including that she helped determine who owed the family money for drugs, directed others to collect money owed, gave approval before drug sales were made, made arrangements to purchase drugs from their supplier, and distributed drugs to lower-level players. *Id*. Under these circumstances, we determined that "a rational fact-finder could have found that Velez's role was that of an organizer, supervisor, or manager of the drug operation, not just a low-level player with no more authority than the others." *Id*.

Based on these cases, it is clear that, to qualify as a drug kingpin, a defendant must be more than a "mere player," *Allen*, 89 Md. App. at 53, or an "important cog" in a trafficking scheme. *Williams*, 329 Md. at 20. Rather, there must be evidence that the

accused acted as "a leader of a drug trafficking network," *id*. at 16-17, and he or she exercised a measure of control over the drug conspiracy. *Allen*, 89 Md. App. at 51-52.[11]

With that background in mind, we address whether there was sufficient evidence to support appellant's drug kingpin conviction. Appellant argues that there was not sufficient evidence that he "organized, supervised, financed or managed Antoine Savoy, Roosevelt Brooks, or Cranston Brown in a drug conspiracy." He asserts that there was no evidence establishing that he controlled their activities, as required by statute.

To be sure, unlike in *Allen* and *Velez*, there was no direct testimony in this case that appellant exerted control over Mr. Brooks, Mr. Savoy, or Mr. Brown. Rather, the State's case was based on circumstantial evidence that appellant was the leader of a drug conspiracy. A conviction, however, may be based on circumstantial evidence. *See Johnson v. State*, 154 Md. App. 286, 305 n.6 (2003) ("Circumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of

_____

[11] We note that, in other state and federal drug kingpin statutes, there is a requirement that the defendant supervise a certain number of co-conspirators. *See State v. Afanador*, 631 A.2d 946, 952 (N.J. 1993) (to convict a defendant as being a drug kingpin under the New Jersey statute there must be evidence that "the drug-trafficking conspiracy involve[s] at least three persons: the kingpin defendant and two others"); 21 U.S.C. § 848(c) (2014) (a defendant must "act in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management"). There is no such requirement in Maryland. *See Williams v. State*, 329 Md. 1, 13 (1992) ("By stiffening the penalties for those who act in the management ranks of drug conspiracies, without regard to the number . . . of coconspirators, the Maryland statute simply constructs a wider net" than other kingpin legislation.).

fact could be convinced beyond a reasonable doubt of the guilt of the accused."), *cert. denied*, 380 Md. 618 (2004).

Here, the circumstantial evidence was sufficient to support the jury's verdict that appellant acted as a drug kingpin, i.e., leader of the drug operation. Sergeant McDonough, an expert in drug distribution organizations, testified that appellant was a mid-to-high level drug dealer. He based his opinion on the large quantities of drugs, as well as materials used to package cocaine and crack cocaine for sale, and materials used to convert cocaine to cocaine base, or crack, found in appellant's photo shop. Moreover, the packages of cocaine found in the photo shop included: (1) packages that were packed to be sold for $150 to $200; and (2) larger, quarter kilo amounts, indicating a dealer who had staff to give the quarter kilos to sell. Appellant also had on his person several independence cards belonging to other people, a common method of payment for drug users, and he had been seen driving several rental cars during the surveillance period, consistent with the practice of drug traffickers. Thus, there was evidence for the jury to find that appellant was a high level drug dealer.

The evidence also showed that appellant's drug operation included Mr. Brooks and Mr. Savoy, and that appellant was the leader of the operation. There was evidence that appellant visited the barbershop that Mr. Savoy co-leased with appellant, and Mr. Brooks frequented, approximately 20 times in the three month surveillance period. Appellant was seen entering and leaving the shop with a bag, and after he left, the CDS activity would

increase.[12]  Mr. Savoy and Mr. Brooks sold drugs to an undercover agent.  A copy of the search warrant for appellant's house was found during a search of Mr. Brooks' house.

In addition, almost $100,000 in cash was found inside a bag in appellant's storage unit, which was leased in his name.  That bag, which matched the description of the bag that appellant was seen carrying when entering and exiting the barbershop, also contained what an expert determined was a ledger to track funds coming in and out.  During the execution of the warrant for appellant's home, detectives found a money counter.  Thus, in addition to being in possession of large quantities of CDS, and quantities of cocaine indicating a dealer who had staff to give large quantities of cocaine to sell, the evidence supported a finding that appellant was the person responsible for retaining large quantities of cash, as well as the means to count and track that cash.  This evidence supports the jury's finding that appellant was a leader of a large drug operation, and that he managed the operation.[13]  Accordingly, the evidence was sufficient to support the drug kingpin conviction.

---

[12] The police also found a lease agreement for the barbershop in the photo shop.

[13] Although Cranston Brown was incarcerated at the time of the central drug conspiracy at issue here, there was evidence that appellant was his "employer" and placed funds in his commissary account after he pled guilty to possession of drugs found in appellant's home.  This evidence also permitted the jury to infer that appellant acted in a supervisory capacity with respect to Mr. Brown.

## III.

## Sentence

Appellant's final contention involves his sentences for possession with intent to distribute more than 448 grams of cocaine (count 3), possession with intent to distribute more than 50 grams of cocaine base (count 4), possession of cocaine with intent to distribute (count 5), and possession of cocaine base with intent to distribute (count 6).[14] He argues that the circuit court erred in sentencing him "both for being a volume dealer and for possession with intent to distribute," asserting that his sentences for possession with intent to distribute cocaine and cocaine base (counts 5 and 6) should merge into the sentences for volume dealing of more than 448 grams of cocaine and more than 50 grams of cocaine base (counts 3 and 4).

Appellant argues that merger is appropriate pursuant to any of the following four theories: (1) the required evidence test; (2) because legislative intent requires merger; (3) the rule of lenity; and (4) principles of fundamental fairness.[15] Noting that this argument was not raised below, appellant asks us to invoke the plain error doctrine to review the merits of his claim.

----

[14] The court sentenced appellant as follows: (1) 25 years for the possession with intent to distribute cocaine conviction; (2) 20 years, consecutive, for the possession with intent to distribute cocaine base conviction; and (3) 5 years, concurrent, for each of the convictions under the volume dealer statute.

[15] In his brief to this Court, appellant also argued that "[t]he volume dealer statute is a sentence-enhancing provision, not a separate offense." At oral argument, however, counsel withdrew this argument.

## A.

## Preservation

Because the merger argument was not raised below, appellant asks us to invoke the plain error doctrine to review the merits of his claim. As the Court of Appeals has explained, however, when a court imposes a sentence that is not authorized by law, the sentence is illegal," and an illegal sentence claim "'is not subject to waiver.'" *Waker v. State*, 431 Md. 1, 7 (2013) (quoting *Johnson v. State*, 427 Md. 356, 371 (2012)). *Accord Fisher v. State*, 367 Md. 218, 292-93 (2001) ("an illegal sentence can, and should, be addressed even if not preserved or properly raised"). In *Britton v. State*, 201 Md. App. 589, 598-99 (2011), Chief Judge Krauser, writing for this Court, explained that, "when the trial court is required to merge convictions for sentencing purposes but, instead, imposes a separate sentence for each unmerged conviction," "the result is the imposition of a sentence 'not permitted by law.'" (Quoting *Campell v. State*, 65 Md. App. 498, 510 (1985)). Thus, at least in a situation where merger is required under the required evidence test or the rule of lenity, the issue of merger is properly before us even in the absence of an objection below. *See Pair v. State*, 202 Md. App. 617, 625, 649 (2011) (Although the failure to merge multiple convictions pursuant to the required evidence test or the rule of lenity renders a sentence illegal, the failure to merge convictions pursuant to fundamental fairness is not inherently an "illegal sentence."), *cert. denied*, 425 Md. 397 (2012).

**B.**

**Prior Statutory Scheme**

Previously, this Court held that a conviction for possession with the intent to distribute merged into a conviction for possession of CDS in a designated amount. *See Simpson v. State*, 121 Md. App. 263, 290 (1998); *Anderson v. State*, 89 Md. App. 712, 727 (1991). Those cases, however, addressed a different statutory scheme.

At the time the above cases were decided, Md. Code (1991 Supp.) Art. 27 § 286 provided as follows:

> (a) Except as authorized by this subheading, it is unlawful for any person:
> (1) To manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance . . . .
>
> ***
>
> (f)(1) *If a person violates subsection (a)(1) of this section and the violation involves* any of the following controlled dangerous substances, in *the amounts indicated*, the person is subject to the penalties provided in paragraph (3) of this subsection upon conviction:
>
> ***
>
> (ii) 448 grams or more of cocaine or 448 grams or more of any mixture containing a detectable amount of cocaine;
> (iii) 50 grams or more of cocaine base, commonly known as "crack."

(Emphasis added). This statute, by its terms, provided that the elements of an offense charged under § 286(a) and § 286(f) contained the same elements, with the exception that § 286(f) contained a quantity requirement. *Anderson*, 89 Md. App. at 726. Section 286

-28-

involved one offense, with an enhanced penalty when the violation involved listed CDS in certain amounts. *Wadlow v. State*, 335 Md. 122, 125, 131-32 (1994).

In 2005, however, the General Assembly revised CL § 5-612 and other sentencing enhancing provisions in response to the Supreme Court's decision in *Blakey v. Washington*, 542 U.S. 296 (2004), which, as the legislature explained, held that "a sentencing judge's imposition of an enhanced penalty, based on facts that were not admitted by the defendant or found by a jury, violated the defendant's right to a trial by jury." S.B. 429, Fiscal and Policy Note (Feb. 15, 2005). To avoid running afoul of *Blakely*, the Committee to Revise Article 27 recommended "repealing the factual penalty enhancement in the penalty provisions and to place the factual circumstance that leads to the increased penalty into the factual elements of the underlying offense *to be charged as its own, separate, new offense*." *Id.* (emphasis added).

Accordingly, the legislature revised CL § 5-612, in pertinent part, as follows:

(a) A person ~~who violates § 5-602 of this subtitle with respect to any of the following controlled dangerous substances in the amounts indicated is subject on conviction to a fine not exceeding $100,000 and the enhanced penalty provided in subsection (c) of this section~~ may not manufacture, distribute, dispense, or possess:

***

(2) 448 grams or more of cocaine;

***

(4) 50 grams or more of cocaine base, commonly known as "crack";

***

-29-

(c)(1) A person who is convicted ~~under § 5-602 of this subtitle with respect to a controlled dangerous substance in an amount indicated in~~ of a violation of subsection (a) of this section shall be sentenced to imprisonment for not less than 5 years and is subject to a fine not exceeding $100,000.

2005 Md. Laws Ch. 485. Pursuant to the 2005 revisions, CL § 5-612 no longer refers to a person "who violates" or "is convicted under" § 5-602.[16]

With this background in mind, we turn to the issue of merger under the new statutory scheme.

## C.

### Required Evidence Test

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution prohibits the State from punishing a defendant multiple times for the same offense. *Sifrit v. State*, 383 Md. 116, 137 (2004), *cert. denied*, 543 U.S. 1056 (2005). *Accord Moore v. State*, 198 Md. App. 655, 684 (2011) ("The merger doctrine, which is derived from both federal and Maryland common law double jeopardy principles, 'provides the criminally accused with protection from, *inter alia*, *multiple punishment stemming from the same offense*.'") (quoting *Purnell v. State*, 375 Md. 678, 691 (2003)). Separate sentences are prohibited when "a defendant is convicted of two offenses based on the same act or acts and

---

[16] CL § 5-602 provides that: "a person may not: (1) manufacture, distribute, or dispense a controlled dangerous substance; or (2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to manufacture, distribute, or dispense a controlled dangerous substance."

one offense is a lesser-included offense of the other.'" *Sifrit*, 383 Md. at 137 (quoting *Khalifa v. State*, 382 Md. 400, 432 (2004)).

In determining whether one offense merges with another, we initially apply the "required evidence test." *Id.* "The required evidence test 'focuses upon the elements of each offense; if all the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter.'" *Kelly v. State*, 195 Md. App. 403, 440 (2010) (quoting *McGrath v. State*, 356 Md. 20, 23 (1999)), *cert. denied*, 417 Md. 502, *cert. denied*, 131 S. Ct. 2119 (2011). "'[I]f each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts.'" *Moore*, 198 Md. App. at 684 (quoting *State v. Lancaster*, 332 Md. 385, 391 (1993)).

Here, appellant asserts that all of the elements of possession with intent to distribute cocaine are also present in the offense of possession with intent to distribute more than 448 grams of cocaine, and that all of the elements of possession with intent to distribute cocaine base are also present in the offense of possession with intent to distribute more than 50 grams of cocaine base, and therefore, merger of the latter offenses is required. The State contends that "[t]his argument is plainly wrong."

CL § 5-602, entitled "Manufacturing, distributing, possession with intent to distribute, or dispensing controlled dangerous substance," provides, in pertinent part, that a person may not "possess a controlled dangerous substance in sufficient quantity reasonably to indicate

-31-

under all circumstances an intent to distribute or dispense a controlled dangerous substance." Pursuant to the statute, the elements of possession with intent to distribute cocaine or cocaine base include: (1) possession of CDS; and (2) circumstances indicating an intent to distribute the CDS.

CL § 5-612, entitled "Volume Dealer," provides as follows:

*Unlawful Amounts.*

(a) A person may not manufacture, distribute, dispense, or possess:

\*\*\*

(2) 448 grams or more of cocaine;

\*\*\*

(4) 50 grams or more of cocaine base, commonly known as "crack."

Pursuant to CL § 5-612, the elements of a volume dealer charge include: (1) manufacturing, distributing, dispensing or possessing CDS; and (2) in the requisite quantity.[17]

Each of these offenses contains an element that the other does not. CL § 5-602 requires an intent to distribute, which is not required by CL § 5-612. And CL § 5-612 requires a minimum quantity of drugs, which is not required by CL § 5-602. Accordingly, the offenses do not merge under the required evidence test. *See Lancaster*, 332 Md. at 391 ("[I]f each offense contains an element which the other does not, there is no merger under

---

[17] The court instructed the jury regarding this count as follows: "The defendant is charged as a volume dealer. A person may not manufacture, distribute, dispense, or possess 44[8] grams or more of cocaine . . . or 50 grams or more of cocaine base, commonly known as crack."

-32-

the required evidence test[,] even though both offenses are based upon the same act or acts.").

**D.**

**Rule of Lenity**

Appellant next argues that, even if his sentences do not merge under the required evidence test, merger is still required. In that regard, he asserts that "it is clear that the Maryland legislature did not intend to authorize multiple punishments based on a single act of possession of a controlled dangerous substance," or, at the very least, the legislative intent is unclear. The State disagrees, arguing that "[n]othing in the plain language of the statutes nor their legislative history indicates that separate punishments cannot be imposed for these separate crimes, to the contrary, it indicates that the circuit court's imposition of sentences here was entirely proper."

Even if offenses do not merge under the required evidence test, merger may still be required under the rule of lenity. *Moore v. State*, 198 Md. App. 655, 686 (2011). "The 'rule of lenity' is a principle of statutory construction" that "amounts to an alternate basis for merger in cases where the required evidence test is not satisfied, and is applied to resolve ambiguity as to whether the Legislature intended multiple punishments for the same act or transaction." *Marlin v. State*, 192 Md. App. 134, 167 (2010). We have explained the rule of lenity as follows:

> "Two crimes created by legislative enactment may not be punished separately
> if the legislature intended the offenses to be punished by one sentence. It is

> when we are uncertain whether the legislature intended one or more than one sentence that we make use of an aid to statutory interpretation known as the 'rule of lenity.' Under that rule, if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge."

*Moore*, 198 Md. App. at 686 (quoting *Clark v. State*, 188 Md. App. 185, 207-08 (2009)).

*Accord Quansah v. State*, 207 Md. App. 636, 653 (2012), *cert. denied*, 430 Md. 13 (2013) (where two sentences "do not merge under the required evidence test because each offense requires proof of distinct elements, nevertheless merger may be necessary if the Legislature did not intend to authorize multiple punishments based on a single act or there is uncertainty as to whether the Legislature intended to do so," and applying the rule of lenity); *Pair v. State*, 202 Md. App. 617, 638 (2011) ("If the Legislature intended two crimes arising out of a single act to be punished separately, we defer to that legislated choice . . . If the legislature intended but a single punishment, we defer to that legislated choice. If we are uncertain as to what the Legislature intended, we turn to the . . . 'Rule of Lenity'") (quoting *Walker v. State*, 53 Md. App. 171, 201 (1982)).

As explained, *infra*, the legislative history establishes that, when Article 27 § 286(f) was enacted, possession of a certain quantity of drugs was not intended to result in a sentence additional to that for possession with the intent to distribute. Rather, it was intended to "distinguish the volume drug dealer from the street corner dealer by establishing a mandatory minimum penalty of 5 years in jail for the possession of certain threshold quantities of a controlled dangerous substance." *State v. Wheeler* 118 Md. App. 142, 148 (1997). Although

the General Assembly subsequently changed CL § 5-612 to make it a separate offense from § 5-602, it did so to avoid a constitutional issue. There is no language in the amended statute, as there is in CL § 5-613, the drug kingpin statute, providing that a conviction under § 5-612 does not merge with other crimes. And CL § 5-612 continues to refer to the penalty as an "[e]nhanced penalty."

Given these circumstances, it appears that the General Assembly did not intend that volume dealing be punished separately from the offense of possession with intent to distribute. At the very least, the intent is ambiguous. In that circumstance, we resolve that ambiguity in appellant's favor. *See Quansah*, 207 Md. App. at 656 ("When 'we are uncertain as to what the Legislature intended, we turn to the . . . 'Rule of Lenity' by which we give the defendant the benefit of the doubt.'") (quoting *Walker*, 53 Md. App. at 201); *Handy v. State*, 175 Md. App. 538, 577 (2007) ("'doubt or ambiguity as to whether the legislature intended that there be multiple punishments for the same act or transaction 'will be resolved against turning a single transaction into multiple offenses'").

In applying the rule of lenity, however, the lesser penalty merges into the greater penalty. *See Spitzinger v. State*, 340 Md. 114, 125 (1995) ("where there is a merger of penalties as distinguished from offenses, on some ground, such as the rule of lenity, the lesser penalty generally merges into the greater penalty"). Here, as indicated, appellant received 25 years for the conviction of possession with intent to distribute cocaine, 20 years, consecutive, for the conviction of possession with intent to distribute cocaine base, and 5

years, concurrent, for each of the volume dealer convictions. Accordingly, for sentencing purposes, appellant's convictions for volume dealing merge into his convictions for possession with intent to distribute.

**SENTENCES IMPOSED PURSUANT TO CL § 5-612 VACATED. JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY OTHERWISE AFFIRMED. COSTS TO BE PAID 67% BY APPELLANT, 33% BY CALVERT COUNTY.**