**HEADNOTES:** *Jason Nathaniel Carter v. State of Maryland,* No. 290, Sept. Term, 2017. Opinion by Fader, J.

CONSTITUTIONAL LAW – REASONABLE LENGTH OF DETENTION FOR TRAFFIC STOP

Where law enforcement officer had not completed citations for traffic violations by the time a canine search produced a positive alert to the presence of a controlled dangerous substance, and officer did not delay in processing the traffic citations, the traffic stop was still ongoing at the time of the canine search. The officer's temporary pauses from processing the traffic citations to brief other officers and to ask the driver to exit the vehicle so that the canine scan could take place neither constituted abandonment of, nor impermissibly delayed, the traffic stop.

CONSTITUTIONAL LAW – PROBABLE CAUSE – SEARCH INCIDENT TO ARREST

Search met the requirements of the search incident to arrest exception to the prohibition against warrantless searches where the positive alert of a drug-sniffing canine on the appellant's automobile provided probable cause to arrest and the search of his person was essentially contemporaneous with his arrest.

CRIMINAL LAW – MANUFACTURE, DISTRIBUTION, DISPENSING, OR POSSESSION OF SPECIFIED AMOUNTS OF CONTROLLED DANGEROUS SUBSTANCES – ELEMENTS OF THE OFFENSE

To establish a violation of § 5-612 of the Criminal Law Article, the plain language of the statute requires the State to prove beyond a reasonable doubt that the defendant: (1) manufactured, distributed, dispensed, or possessed one of the specified controlled dangerous substances; (2) in the requisite quantity established by the statute. The offense does not require an intent to distribute.

STATUTORY INTERPRETATION – INTERPRETIVE WEIGHT OF CAPTIONS AND CATCHLINES

In determining the meaning of a statute, we look to the language of the statute itself, not a caption or catchline. Captions or catchlines, whether added by the General Assembly or by publishers, have no interpretive weight.

Circuit Court for Montgomery County
Case No. 124874

_____

JASON NATHANIEL CARTER

v.

STATE OF MARYLAND

_____
_____

Graeff,
Fader,
Eyler, James R.
  (Senior Judge, Specially Assigned),


JJ.
_____

Opinion by Fader, J.
_____

Filed: April 2, 2018

A Montgomery County jury convicted the appellant, Jason Nathaniel Carter, of possession of crack cocaine and possession of 50 grams or more of crack cocaine,[1] but acquitted him of possession with intent to distribute crack cocaine. Mr. Carter challenges the circuit court's: (1) denial of his motion to suppress more than 70 grams of crack cocaine and more than three grams of cocaine that police seized from him during a traffic stop; and (2) refusal to instruct the jury that "intent to distribute" is an element of the offense of possession of 50 grams or more of crack cocaine.[2] We find no error in the circuit court's denial of the motion to suppress or in its jury instruction, and so affirm.

## BACKGROUND

In a challenge to a ruling on a motion to suppress, we are limited to considering the facts presented at the motions hearing, *Nathan v. State*, 370 Md. 648, 659 (2002), and we must view those facts in the light most favorable to the prevailing party, *Belote v. State*, 411 Md. 104, 120 (2009). Our discussion of background facts adheres to both of these principles.

In the early morning hours of April 4, 2014, Montgomery County Patrol Officer Michael Mancuso observed a car being driven by Mr. Carter fail to make a complete stop at a stop sign while driving in a high-crime area known for drug activity. Officer Mancuso

---

[1] As discussed below, although the offense of possession of 50 grams or more of a controlled dangerous substance is commonly referred to as "volume dealer," the crime includes not only distribution of large quantities of controlled dangerous substances, but also mere possession of those same quantities.

[2] Mr. Carter frames his questions presented as "1. Did the trial court err in denying the motion to suppress?" and "2. Did the trial court err in refusing to instruct the jury as to the element of an intent to distribute for purposes of the 'volume dealer' charge?"

followed the car, pacing its speed at approximately 48 miles per hour in a 40 miles-per-hour zone. At approximately 12:52 a.m., Officer Mancuso pulled Mr. Carter over and obtained his license and registration. Mr. Carter displayed signs of being extremely nervous.

Officer Mancuso returned to his car at 12:57 a.m. and promptly: (1) requested a K-9 unit to conduct a scan for narcotics; and (2) ran a records check, which revealed that Mr. Carter's license was valid and that he did not have any outstanding warrants. Officer Mancuso estimated that it took him approximately eight-to-ten minutes to perform the various license and records checks. At 1:00 a.m., after the records check was complete, Officer Mancuso opened the electronic system to write Mr. Carter warning citations for both the failure to stop and speeding violations.[3] From that point, it "probably took about five to seven minutes" to write the citations. During that same time, Officer Mancuso also briefed another officer, Officer Gary Finch, who had arrived on the scene at approximately 1:02 a.m.

Officer Jason Buhl of the K-9 unit, along with Konner, his drug-sniffing dog, arrived on scene at 1:07 a.m. At that time, Officer Mancuso had not yet finished writing the citations. At approximately 1:09 a.m., after he had briefed Officer Buhl, Officer Mancuso ordered Mr. Carter out of his car and to stand behind the patrol car so that the canine scan

---

[3] The inconsistency between Officer Mancuso's testimony that it took eight-to-ten minutes to complete the checks and the lapse of only three minutes between his return to his car at 12:57 a.m. and opening the electronic system at 1:00 a.m. is discussed below in footnote 5.

could proceed. Within 15-20 seconds, Konner alerted to the presence of narcotics on the driver's seat of Mr. Carter's car.

After a search of the car yielded nothing illegal, Officer Michael Murphy conducted a pat-down search of Mr. Carter. After Officer Murphy noticed an unnatural bulge in the area of Mr. Carter's groin, Mr. Carter became combative. It took all four officers to place Mr. Carter in handcuffs. The search ultimately produced two plastic baggies containing more than 70 grams of crack cocaine and three grams of cocaine. The officers then placed Mr. Carter under arrest.

Mr. Carter moved to suppress the drugs. After a hearing at which Officers Mancuso and Buhl, along with Mr. Carter, testified, the Circuit Court for Montgomery County made findings of fact, including:

- Upon returning to his vehicle, Officer Mancuso "promptly" called for the K-9 unit and initiated the records checks (including license, warrant, and case search).
- Officer Buhl and Konner "arrived before Officer Mancuso had finished writing the tickets."
- Mr. Carter "was removed from his vehicle so the canine search could be conducted."
- The drug-sniffing dog "more or less immediately alerted."
- "[T]here was no delay, intentional or otherwise, by the stopping officer between the time he began questioning the driver at 12:51:57 and 1:00am."
- "[T]here was no delay by the stopping officer between 1:00am and 1:07:19am when the canine officer arrived."
- This is not a case where the officer engaged in delay and "dilly dallied waiting for the canine officer. That's not this case."
- "[T]here was no delay. This was ordinary course."

3

The court also concluded that the search was "incident to [Mr. Carter's] arrest," and so denied the motion to suppress.

Mr. Carter was tried before a Montgomery County jury on charges of possession of crack cocaine, possession with intent to distribute crack cocaine, and possession of 50 grams or more of crack cocaine. At the conclusion of a three-day jury trial, the trial court instructed the jury that to convict Mr. Carter of the crime of possession of 50 grams or more of crack cocaine, which the court referred to as "volume dealer," the State must prove beyond a reasonable doubt that Mr. Carter "possessed 50 grams of crack cocaine." The trial court rejected Mr. Carter's contention that the jury should also be instructed that "volume dealer" required the State to prove that Mr. Carter intended to distribute the crack cocaine. The jury acquitted Mr. Carter of possession with intent to distribute, but convicted him of both simple possession and possession of 50 grams or more of crack cocaine. The trial court merged the two convictions and sentenced Mr. Carter to the mandatory minimum sentence of five years' incarceration for possession of 50 grams or more of crack cocaine.

## DISCUSSION

**I.    THE MOTIONS COURT DID NOT ERR IN DENYING MR. CARTER'S MOTION TO SUPPRESS.**

Mr. Carter argues that the suppression court's ruling must be reversed for two reasons. First, he contends that Officer Mancuso lacked reasonable suspicion to authorize what was effectively a second stop to investigate potential drug activity. Mr. Carter concedes that Officer Mancuso had probable cause to detain him for the traffic offenses. But he contends that Officer Mancuso abandoned that traffic stop when he paused from

4

writing Mr. Carter's citations to assist Officer Buhl with the canine search. Thus, Mr. Carter reasons, the traffic stop ended at that point and Officers Mancuso and Buhl needed reasonable suspicion of drug activity to proceed with the canine search. Second, Mr. Carter argues that Officer Mancuso's search of his person was not incident to arrest because Mr. Carter was not yet arrested, and there was no indication that he would be arrested, until after the drugs were found.

When reviewing a ruling on a motion to suppress evidence, we defer to the suppression court's findings of fact unless clearly erroneous. *Holt v. State*, 435 Md. 443, 457 (2013); *Longshore v. State*, 399 Md. 486, 498 (2007). We only consider the facts presented at the motions hearing, *Nathan*, 370 Md. at 659, and we view those facts in the light most favorable to the prevailing party, *Belote*, 411 Md. at 120. "[W]e review the hearing judge's legal conclusions *de novo*, making our own independent constitutional evaluation as to whether the officer's encounter with the defendant was lawful." *Sizer v. State*, 456 Md. 350, 362 (2017). Each of these encounters is unique, and our review looks to the totality of the circumstances on the specific facts of the case before us. *Id.* at 363; *Belote*, 411 Md. at 120.

A.    **The Original Traffic Stop Was Ongoing When the Canine Alert Occurred.**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The Court of Appeals has generally

5

interpreted Article 26 of the Maryland Declaration of Rights to provide the same protections as the Fourth Amendment. *Byndloss v. State*, 391 Md. 462, 465 n.1 (2006).

The Fourth Amendment's protections extend to investigatory traffic stops such as that of Mr. Carter. *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Ferris v. State*, 355 Md. 356, 369 (1999). In determining whether such stops violate an individual's Fourth Amendment rights, courts examine the objective reasonableness of the stop. *Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, an otherwise-valid traffic stop does not become unconstitutional just because the actual purpose of the law enforcement officer making the stop was to investigate potential drug crimes.

So-called *Whren* stops—valid but pretextual traffic stops undertaken for the primary purpose of investigating other illegal activity—though "a powerful law enforcement weapon," *Charity v. State*, 132 Md. App. 598, 601 (2000), are restricted in scope and execution.[4] A *Whren* stop "'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Ferris*, 355 Md. at 369 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). This Court has recognized, though, that officers may pursue investigations into both the traffic violation and another crime "simultaneously, with each pursuit necessarily slowing down the other to some modest extent." *Charity*, 132 Md. App.

---

[4] In addition to his other arguments, Mr. Carter also contends that *Whren* stops violate the Fourth Amendment and Article 26. Although he is entitled to that opinion, the Supreme Court has not retreated from its holding in *Whren* and the Court of Appeals has repeatedly upheld the validity of *Whren* stops, as has this Court. *See, e.g.*, *Grant v. State*, 449 Md. 1, 15-16 (2016); *Darling v. State*, 232 Md. App. 430, 452 (2017). Other than his fervent belief that this controlling precedent is wrong, Mr. Carter has not provided any basis on which we could disregard the determinations of our superiors on this point of law.

at 614. But investigation into the original traffic violation cannot "be conveniently or cynically forgotten and not taken up again until after [the other] investigation has been completed or has run a substantial course." *Id.* at 614-15; *see also Whitehead v. State*, 116 Md. App. 497, 506 (1997) ("Stopping a car for speeding does not confer the right to abandon or never begin to take action related to the traffic laws . . . .").

The purpose of a traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citation omitted); *see also Byndloss*, 391 Md. at 483. Thus, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614. Because a scan by a drug-sniffing dog serves no traffic-related purpose, traffic stops cannot be prolonged while waiting for a dog to arrive. *Henderson v. State*, 416 Md. 125, 149-50 (2010). Once the officer completes the tasks related to the original traffic stop or extends the stop beyond when it reasonably should have been completed, any continued detention is considered a second stop for Fourth Amendment purposes, and thus requires new, constitutionally-sufficient justification. *Byndloss*, 391 Md. at 483. Absent such independent justification, any further detention, even if very brief, violates the detainee's protection against unreasonable seizures.

We determine the reasonableness of the duration of a *Whren* stop on a case-by-case basis. *Jackson v. State*, 190 Md. App. 497, 512 (2010). "There is no set formula for measuring in the abstract what should be the reasonable duration of a traffic stop." *Charity*, 132 Md. App. at 617. Thus, a very lengthy detention may be reasonable in one

7

circumstance, and a very brief one may be unreasonable in another. *Id.* Generally, the reviewing court must look to whether the stop "'extended beyond the period of time that it would reasonably have taken for a uniformed officer to go through the procedure involved in issuing a citation to a motorist.'" *Ferris*, 355 Md. at 371-72 (quoting *Pryor v. State*, 122 Md. App. 671, 682 (1998)).

Here, the trial court, after hearing testimony from Officers Mancuso and Buhl, as well as Mr. Carter, found that Officer Mancuso promptly took the appropriate steps to process Mr. Carter's traffic violations and did not engage in any delay. Officer Mancuso returned to his vehicle from his initial interaction with Mr. Carter at 12:57 a.m., and it was then that he both called for the K-9 unit and began processing the necessary records checks. By 1:07 a.m., when Office Buhl arrived with Konner, Officer Mancuso had processed the records checks, briefed Officer Finch, and was in the process of writing the citations. In light of Officer Mancuso's testimony that it takes him eight-to-ten minutes to conduct all of the necessary records checks and five-to-seven minutes to write the citations at issue, it was not unreasonable that he was still writing the traffic citations when Officer Buhl arrived.[5] Indeed, both officers testified that was the case and the trial court found that testimony credible.

___

[5] Our conclusions are not affected by the relatively minor discrepancy in the timeline provided by Officer Mancuso. Officer Mancuso testified that it generally takes him eight-to-ten minutes to complete the necessary records checks. He further testified that he always completes those checks before he opens the electronic system to write citations. However, the electronic record in this case reflects that Officer Mancuso returned to his vehicle at 12:57 a.m. and opened the electronic system only three minutes later, at 1:00 a.m. There are many possible explanations for this discrepancy, including that Officer Mancuso did not recall having opened the electronic system early on this occasion, that the records

8

We conclude, based on our independent constitutional appraisal of the events as a whole, that there was no impermissible delay. Giving proper deference to the trial court's first-level findings of fact, the conduct of the officers was reasonable and does not suggest impermissible delay. Moreover, the entire episode, from initiation of the traffic stop until the alert, took approximately 17 minutes, and there were only ten minutes between the time Officer Mancuso returned to his car and Officer Buhl's arrival. Although the absolute amount of time a stop takes is not dispositive, *Byndloss*, 391 Md. at 485 ("We will not simply determine that a stop was unreasonable due to the length of time over which it occurred."), nothing about a stop of 17 minutes is itself unreasonable, *see, e.g.*, *id.* at 469, 491-92 (upholding detention of approximately 30 minutes); *State v. Ofori*, 170 Md. App. 211, 243 (2006) (stating that a "24–minute period of delay was not, in and of itself, especially inordinate"); *Jackson*, 190 Md. App. at 512 (noting that "[i]n almost all of the cases, the critical breaking point between permissible and unreasonably prolonged traffic detentions occurs at somewhere near the 20 to 25 minute marker").

---

checks went especially fast on this occasion, that Officer Mancuso misallocated the amount of time he spends as between records checks and writing citations, or that he simply made a mistake as to that time estimate. However, viewed in the light most favorable to the State, even assuming that he had completed all checks and started writing citations by 1:00 a.m., Officer Mancuso's testimony that it would take him five-to-seven minutes to write citations and that he paused during that process to brief Officer Finch still supports the trial court's findings that: (1) he did not delay; and (2) he was still writing the citations when Officer Buhl arrived. *See, e.g.*, *Longshore v. State*, 399 Md. 486, 498 (2007) (stating that "when there is a conflict in the evidence, an appellate court will give great deference to a hearing judge's determination and weighing of first-level findings of fact"); *In re Tariq A-R-Y*, 347 Md. 484, 488 (1997) (stating that "we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of witnesses and to weighing and determining first-level facts").

Mr. Carter contends that regardless of the amount of time that elapsed before the canine scan, we should find that Officer Mancuso impermissibly abandoned the traffic stop when he paused from writing citations to brief Officer Buhl and then to ask Mr. Carter to exit his vehicle so that the canine search could proceed. We disagree. The suppression court's finding that Officer Mancuso never abandoned the tasks relevant to the traffic stop is supported by Officer Mancuso's testimony. Mr. Carter's contention that *any* break from tasks related solely to processing the traffic violations constitutes abandonment of the traffic stop is both unreasonable and inconsistent with our prior decisions. *See Charity*, 132 Md. App. at 614 (stating that officers may pursue investigations into both the traffic violation and another crime "simultaneously, with each pursuit necessarily slowing down the other to some modest extent"). And we cannot say that the tasks Officer Mancuso performed were unreasonable under the circumstances, as he simply briefed arriving officers on the situation and approached Mr. Carter to ask him to exit his vehicle. *See McCree v. State*, 214 Md. App. 238, 263 n.7 (2013) (stating that an officer's interruption of a traffic stop to brief other newly arrived officers was neither unreasonable nor "rendered [the stop] impermissibly long"). That other officers were present on the scene does not render it unreasonable for Officer Mancuso to have performed these tasks, as he was the original officer on the scene and the only one who had interacted with Mr. Carter to that point. This was not abandonment of the purpose of the traffic stop, but a momentary pause for permissible multi-tasking that, based on the findings of the suppression court, did not

10

cause the seizure to extend beyond the time that was necessary to effectuate the traffic stop.[6]

In sum, the original traffic stop had not ended, nor had it been extended improperly, at the time Konner alerted because it occurred within the time that "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614. Because we find that the traffic stop was ongoing when the canine alert occurred, there was no "second stop" and we need not address whether Officer Mancuso had a reasonable suspicion to investigate drug activity.

## B.  Officer Mancuso's Search of Mr. Carter Was Incident to Mr. Carter's Arrest.

Mr. Carter also argues that even if the traffic stop continued until the alert, Officer Mancuso still lacked probable cause to search his person. In making this argument, Mr. Carter raises and then knocks down several strawmen,[7] but never addresses squarely the

---

[6] We also observe that even if Mr. Carter had proven that Officer Mancuso should have completed writing the citations by the time Officer Buhl arrived, that would not have ended the traffic stop. A traffic stop ends only when the officer provides the citation, license, and registration back to the motorist; requests the motorist to acknowledge receipt of the citation; and the motorist is legally free to leave. *Ferris*, 355 Md. at 373; *see also* Md. Code Ann., Transp. § 26-203(b)(1) (requiring an officer to "ask the [motorist] to acknowledge receipt of a copy of the citation").

[7] Mr. Carter first argues that the *Carroll* Doctrine only authorizes a search of a vehicle, not people within the vehicle. *See Carroll v. United States*, 267 U.S. 132 (1925). But the State does not rely on the *Carroll* Doctrine as providing probable cause for the search of Mr. Carter's person. Mr. Carter also contends that the Court of Appeals held in *State v. Wallace* that a "positive canine alert to contraband in a vehicle, without more, does not establish probable cause to search all of the passengers in a vehicle." 372 Md. 137, 141 (2002). But Mr. Carter was not a passenger in his vehicle; he was its driver and sole occupant. Mr. Carter also argues that Officer Mancuso lacked reasonable suspicion that Mr. Carter was armed and dangerous, but the State does not argue to the contrary.

11

basis on which the suppression court actually upheld the search, which is that it was incident to a lawful arrest.  This Court has repeatedly found both (1) that a canine alert provides probable cause to arrest, *see, e.g.*, *State v. Harding*, 196 Md. App. 384, 390 (2010) ("There is [] no question but that [a canine's] positive alert furnished probable cause for . . . the arrest of the appellee as the driver of the [vehicle]."); *Ofori*, 170 Md. App. at 221 (stating that at the time of a canine alert there was "unquestionable probable cause for the warrantless arrest of" a vehicle's driver); and (2) that "the 'search incident to an arrest' exception to the warrant requirement is applicable as long as the search is 'essentially contemporaneous' with the arrest," *Barrett v. State*, 234 Md. App. 653, 672 (2017) (quoting *Wilson v. State*, 150 Md. App. 658, 673 (2003)), *cert. denied*, Pet. Dock. No. 429 (Feb. 16, 2018); *see also Lee v. State*, 311 Md. 642, 668 (1988) (stating that a search that is followed by an arrest is considered incident to that arrest if "there was probable cause to support an arrest at the time of the search").  Here, the canine alert provided probable cause to arrest Mr. Carter and the search of his person was essentially contemporaneous with his arrest.  Under our precedent, therefore, this was a search incident to arrest; nothing more was required.

Mr. Carter's argument to the contrary relies primarily on dicta in this Court's decision in *State v. Funkhouser*, 140 Md. App. 696 (2001),[8] which he contends requires a

---

[8] The basis for our holding in *Funkhouser* was that, viewing the facts in the light most favorable to Mr. Funkhouser (as the prevailing party below), the initial traffic stop was improper and so everything that followed from that initial stop was properly suppressed as fruit of the poisonous tree.  140 Md. App. at 705-06.  Although we proceeded

court, when faced with a search conducted contemporaneously with an arrest, to make an express finding that the arrest would have occurred regardless of the results of the search. To the contrary, as we confirmed most recently last year in *Barrett*, the search incident to arrest exception "is applicable as long as the search is 'essentially contemporaneous' with the arrest." 234 Md. App. at 672 (quoting *Wilson*, 150 Md. App. at 673). Here, the search and the arrest were contemporaneous. That Officer Mancuso did not place Mr. Carter under arrest immediately after the canine alert does not suggest that he did not intend to do so, especially in the context of a chain of events that, in total, lasted only a few minutes. "'There is no case in which a defendant may validly say, 'Although the officer had a right to arrest me at the moment when he seized me and searched my person, the search is invalid because he did not in fact arrest me until afterwards.''" *Conboy v. State*, 155 Md. App. 353, 365 (2004) (quoting *Sibron v. New York*, 392 U.S. 40, 77 (1968) (Harlan, J., concurring)). We find no error or abuse of discretion in the suppression court's determination that Mr. Carter was searched incident to his arrest, and affirm the suppression court's denial of the motion to suppress.

## II. THE TRIAL COURT'S JURY INSTRUCTION WAS VALID.

### A. Based on the Plain, Unambiguous Language of the Statute, the Trial Court Properly Instructed the Jury.

Mr. Carter also argues that the trial court erred by not instructing the jury that an "intent to distribute" is an element of the crime of possession of 50 grams or more of crack

---

to address several additional arguments, including whether the search could be justified as a search incident to arrest, the remainder of that opinion is dicta.

cocaine. An appellate court reviews a trial court's jury instruction for an abuse of discretion. *Stabb v. State*, 423 Md. 454, 465 (2011). To make this determination, we look to three factors: "'(1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given.'" *Keller v. Serio*, 437 Md. 277, 283 (2014) (quoting *Stabb*, 423 Md. at 465). Although the overall determination is one of abuse of discretion, "we review without deference . . . whether the jury instruction was a correct statement of the law." *Seley-Radtke v. Hosmane*, 450 Md. 468, 482 (2016). The complainant bears the burden "'to show both prejudice and error.'" *Lindsey v. State*, 235 Md. App. 299, 331 (2018) (quoting *Tharp v. State*, 129 Md. App. 319, 329 (1999), *aff'd* 362 Md. 77 (2000)).

To determine the elements of a statutory offense, we use the standard tools of statutory interpretation. *State v. Bey*, 452 Md. 255, 265 (2017). Where the plain language of the statute, within the statutory scheme and in light of the legislative purpose of the statute, is clear and unambiguous, no further inquiry is necessary. *Id.* at 265-66. We must give "words their natural and ordinary meaning," *Davis v. State*, 426 Md. 211, 218 (2012), and "the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense," *Bey*, 452 Md. at 266.

Normally, where the plain language of a statute is clear, our inquiry into the legislative intent ends. *Id.* at 265. We may though, on occasion, "examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language." *Moore v. State*, 424 Md. 118, 128 (2011). These extrinsic sources can include "[a] bill's title,

amendments that occurred as the bill passed through the legislature, and a bill's relationship to earlier and subsequent legislation." *Clark v. State*, 348 Md. 722, 726 (1998).

The instruction given by the trial court was: "In order to convict the defendant of volume dealer, the State must prove that the defendant possessed 50 grams of crack cocaine." The offense with which we are concerned is a violation of § 5-612(a)(4) of the Criminal Law Article. At the time of Mr. Carter's offense, § 5-612(a)(4) provided in relevant part that "(a) A person may not manufacture, distribute, dispense, or possess . . . (4) 50 grams or more of cocaine base, commonly known as 'crack.'"[9]

As this Court noted in *Kyler v. State*, the plain language of § 5-612(a) requires only two elements for a conviction: "(1) manufacturing, distributing, dispensing or possessing [a controlled dangerous substance]; and (2) in the requisite quantity." 218 Md. App. 196, 227 (2014). Nowhere in the plain language of the statute is there any indication that an "intent to distribute" is an element of the crime, either express or presumed. Nor, as discussed further below, is there any context from the remaining provisions of the statute that would counsel a different interpretation. Thus, the trial court's instruction, which generally mirrored the statutory text, was a correct statement of law. *See Lindsey*, 235 Md. App. at 331-32 (mirroring the language of the statute "indicat[es] that the instruction given by trial judge was a correct statement of the law"). Because the instruction was also

---

[9] As part of the Justice Reinvestment Act, the General Assembly amended § 5-612(a)(4) in 2016 to equalize the punishments for cocaine and crack cocaine. 2016 Md. Laws ch. 515 § 2. The statute now prohibits the manufacture, distribution, dispensing, or possession of 448 grams or more of crack cocaine. *Id.*; Crim. Law § 5-612(a)(4).

applicable under the facts of this case, the trial court properly overruled Mr. Carter's objection.

**B. Section 5-612(a)(4) Does Not Contain an "Intent to Distribute" Element.**

Even if we were to go behind the statutory language, we would still affirm the trial court's instruction. Mr. Carter's argument that we should read an "intent to distribute" element into § 5-612(a) is based partly in legislative history and partly in the headings that publishers have added to or left in the statute. To understand the flaws in his argument, we pause briefly to trace the relevant history of the statute.

As we described in *Kyler*, under former § 286 of Article 27 of the Maryland Code, the manufacture, distribution, dispensing, or possession of a controlled dangerous substance in a specified quantity (50 grams or more for crack cocaine) was not a stand-alone criminal offense. 218 Md. App. at 223-24. Instead, it was a penalty enhancement for someone convicted of possession with intent to distribute, and it resided in the same statutory section as the underlying crime. *Id.*

In 2002, as part of the codification of the new Criminal Law Article, the General Assembly created § 5-612, which it titled "Volume Dealer." 2002 Md. Laws ch. 26 § 2.[10]

---

[10] As enacted in 2002, § 5-612 provided, in relevant part:

5-612. Volume Dealer.

(a) Unlawful amounts.

A person who violates § 5-602 of this subtitle with respect to any of the following controlled dangerous substances in the amounts indicated is subject on conviction to a fine not exceeding $100,000 and the enhanced penalty provided in subsection (c) of this section:

16

Although codified in a separate statutory section from the crime of possession with intent to distribute, the "Volume Dealer" provision did not purport to establish a stand-alone criminal offense. Instead, it merely provided an "enhanced penalty" for one who was convicted of violating § 5-602 of the Criminal Law Article, which prohibits, among other things, possession with intent to distribute.[11]

In 2005, for reasons we explained in *Kyler*, 218 Md. App. at 224, the General Assembly repealed and reenacted § 5-612. The relevant statutory changes, showing additions in italics and deletions in strikeouts, were:

. . .

(4) 50 grams or more of cocaine base, commonly known as "crack";

. . .

> (b) For the purpose of determining the quantity of a controlled dangerous substance involved in individual acts of manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense under subsection (a) of this section, the acts may be aggregated if each of the acts occurred within a 90-day period.

(c) Enhanced penalty. (1) A person who is convicted under § 5-602 of this subtitle with respect to a controlled dangerous substance in an amount indicated in subsection (a) of this section shall be sentenced to imprisonment for not less than 5 years.

. . . .

2002 Md. Laws ch. 26 § 2.

[11] Section 5-602(2) provides that "a person may not . . . possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance."

5-612.  ~~Volume Dealer.~~[12]

(a) A person ~~who violates § 5-602 of this subtitle with respect to any of the following controlled dangerous substances in the amounts indicated is subject on conviction to a fine not exceeding $100,000 and the enhanced penalty provided in subsection (c) of this section~~ *may not manufacture, distribute, dispense, or possess*:

. . .

       (4) 50 grams or more of cocaine base, commonly known as "crack";

. . .

(b) For the purpose of determining the quantity of a controlled dangerous substance involved in individual acts of manufacturing, distributing, dispensing, or possessing ~~with intent to manufacture, distribute, or dispense~~ under subsection (a) of this section, the acts may be aggregated if each of the acts occurred within a 90-day period.

(c) ~~Enhanced penalty.~~  (1) A person who is convicted ~~under § 5-602 of this subtitle with respect to a controlled dangerous substance in an amount indicated in~~ *of a violation of* subsection (a) of this section shall be sentenced to imprisonment for not less than 5 years *and is subject to a fine not exceeding $100,000.*

. . . .

2005 Md. Laws ch. 482 § 1.  The General Assembly stated that these changes were made "FOR the purpose of altering certain provisions of law to establish new offenses in place of factual determinations that enhance penalties; . . . [and] establishing the offense and clarifying the penalties for manufacturing, distributing, dispensing, or possessing certain quantities of certain controlled dangerous substances; . . . ."  2005 Md. Laws ch. 482.

---

[12] Chapter 482, as enacted, did not expressly identify the deletion of the section title "Volume Dealer" and the catchline "Enhanced penalty," but those headings did not appear in the statute as the General Assembly reenacted it, and they were thus not part of the statute as of its October 1, 2005 effective date.

Mr. Carter contends that § 5-612 includes as an element of the offense an "intent to distribute" the controlled dangerous substance at issue because: (1) if the General Assembly had wanted "to eliminate intent as an element" of the crime, it must have expressly stated so in the statute; (2) this Court concluded in *Kyler* that the legislative history was ambiguous as to whether the General Assembly intended for volume dealing to be punished separately from the crime of possession with the intent to distribute; and (3) the offense must necessarily require intent to distribute "because of its relationship to the crime of possession with intent to distribute as a penalty enhancement."

Even if we were to find the statute ambiguous, which we do not, Mr. Carter's contentions cannot withstand the legislative history set forth above. As an initial matter, the General Assembly made clear that its intent was not to alter the elements of an existing crime, but to establish a new crime: the manufacture, distribution, dispensing, or possession of certain quantities of controlled dangerous substances. What had previously been a penalty enhancement was unambiguously made a stand-alone crime. Moreover, the General Assembly could hardly have been clearer in removing any hint of an intent requirement from the statute. The legislature removed from the statute the only express mention of intent to distribute, which had appeared in subsection (b), as well as the references in subsections (a) and (c) to the crime of possession with the intent to distribute. No direct or indirect reference to intent to distribute survived.

Mr. Carter's reliance on *Kyler* is mistaken, as he improperly conflates two different parts of that opinion. In *Kyler*, we first applied the required evidence test to determine if two offenses—violation of § 5-612(a) and the separate crime of possession with intent to

distribute—merged. In the course of determining that they did not, we held that § 5-612(a) does not require proof of an intent to distribute. 218 Md. App. at 226-27.

Only after reaching that conclusion did we proceed, in applying the rule of lenity, to explore the historical relationship between those two crimes for the purpose of determining whether the General Assembly intended that they be *punished* separately. *Id.* at 227-30. Our conclusion that the General Assembly did not appear to so intend did not in any way undermine our holding that § 5-612(a) does not require an intent to distribute.[13]

Mr. Carter's reliance on the relationship of § 5-612(a) "to the crime of possession with intent to distribute as a penalty enhancement" is similarly mistaken. Although § 5-612(a) indisputably arose from what was initially a mere penalty enhancement, the General Assembly just as indisputably broke that link with its 2005 changes to the statute. We could not adopt Mr. Carter's argument without implicitly reading those references back into the statute. That we are not permitted to do. *See Moore*, 424 Md. at 129 (quoting *Henriquez v. Henriquez*, 413 Md. 287, 299 (2010)) (observing that the Court of Appeals has "frequently stated that '[w]e will not . . . judicially insert language [into a statute] to impose exceptions, limitations, or restrictions not set forth by the legislature'"); *McGlone*

---

[13] In finding that the offenses merged for sentencing purposes under the rule of lenity, we noted that there was no language in § 5-612 that a conviction under that statute did not merge with other crimes. *Kyler*, 218 Md. App. at 229-30. Although we also noted that § 5-612 "continues to refer to the penalty as an '[e]nhanced penalty,'" 218 Md. App. at 229, that statement was based on the heading to subsection (c) that was included by the publishers. As explained above, this heading does not appear in the statute as it was enacted by the General Assembly and does not detract from the conclusion, discussed in *Kyler*, that § 5-612 does not require proof of an intent to distribute. 218 Md. App. at 226-27.

20

*v. State*, 406 Md. 545, 559 (2008) ("We interpret the words enacted by the Maryland General Assembly; we do not rewrite the language of a statute to add a new meaning.").

We would be remiss if we did not comment on the potentially unfortunate role of the headings added to—or at least not properly deleted from—the statute by publishers in assembling and reporting their versions of the Maryland Code. As noted, the version of § 5-612 enacted by the General Assembly in 2005 did not include either the Section title "Volume Dealer" or the subsection (c) heading "Enhanced penalty." Similarly, the General Assembly's reenactment of that provision in chapter 515 of the 2016 Laws of Maryland also does not include either of those phrases. 2016 Md. Laws ch. 515 § 2. Nonetheless, the printed volumes and online versions of the Maryland Annotated Code compiled by both LexisNexis (2012 Repl. & 2017 Supp.) and West (2002 & 2017 Supp.) continue to include both the title and the heading.

It is, of course, the words of the General Assembly that are law in Maryland and that we interpret and apply. "In determining the meaning of a statute, we look to the words of the statute itself, not a caption." *State v. Holton*, 193 Md. App. 322, 365 (2010). Even "captions or catchlines" that are added by the General Assembly "(i) may not be considered as a title of the section or subsection; and (ii) may not be considered as a title if the section, subsection, caption, or catchline is amended or reenacted." Md. Code Ann., Gen. Prov. § 1-208(2).[14] Such headings or catchlines added by publishers are, if possible, even less

---

[14] The General Assembly expressly made this point specific to the catchlines and captions contained in the 2002 code revision, when § 5-612 was first created. Section 14 of Chapter 26 of the 2002 Laws of Maryland provided "[t]hat the catchlines, captions, and

significant,[15] and certainly cannot render an otherwise unambiguous statute ambiguous. Indeed, they have no role whatsoever in our interpretation and application of Maryland law.

Although including titles and headings not supplied by the General Assembly can certainly provide some assistance to a user, they can also prove misleading when they are not accurate. In this case, the statutory changes made in 2005 rendered "Volume Dealer" an inaccurate title for the offense described in § 5-612(a), and "Enhanced penalty" an inaccurate descriptor of the penalty established by § 5-612(c). The offense is the manufacture, distribution, dispensing, or possession of a specified quantity of controlled dangerous substances, and the penalty provided in subsection (c) is simply the penalty for that crime, not an enhancement of any other penalty.

---

Revisor's Notes contained in this Act are not law and may not be considered to have been enacted as a part of this Act."

[15] The publishers recognize this. West, under the heading "Rules of Interpretation" in the preface to the Criminal Law Article of its Annotated Code of Maryland, quotes verbatim from § 1-208 of the General Provisions Article. LexisNexis, in its preface to the now nearly-completely-repealed Article I of the Maryland Code, states:

> Headings or 'catchlines' for Code sections and subsections are generally created and maintained by the publisher. Pursuant to § 1-208 of the General Provisions Article, they are 'mere catchwords' and are not to be deemed or taken as the official title of a section or as a part of the section. Your suggestions for the improvement of particular catchlines are invited.

Md. Code Ann., Art. 1, x (LexisNexis 2017 Repl.) By delivering copies of this opinion to LexisNexis and West, we hereby suggest that the heading for § 5-612 be changed from "Volume Dealer" to "Manufacture, Distribution, Dispensing, or Possession of Specified Amounts," and that the heading before subsection (c) be changed from "Enhanced Penalty" to "Penalty."

We observe that the trial court, without objection from either party, referred to the crime at issue as "volume dealer." Although an incorrect descriptor of the offense for the reasons we have discussed, we discern no prejudice to Mr. Carter, who could only have benefitted from the inaccurate implication that the State had the additional burden of proving that Mr. Carter was a "dealer" of crack cocaine. Any error from the use of that term was thus harmless.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**