*Tyron Devon Borges v. State of Maryland*, No. 134, Sept. Term, 2023.
Opinion filed on August 1, 2024, by Wells, C.J.

**CRIMINAL LAW – SEARCH, SEIZURE, AND ARREST – IN GENERAL**

Under *Chimel v. California*, 395 U.S. 752 (1969), a search incident to arrest allows the police to search the person of the arrestee and any area within his immediate control to protect themselves from danger and to prevent the destruction or concealment of evidence. Here, the officers searched clothing within appellant's reach, lunge, or grasp for their own safety because they were executing an arrest warrant for first degree assault – a violent crime.

**CRIMINAL LAW – SEARCH, SEIZURE, AND ARREST – IN GENERAL**

*Chimel* and its progeny do not establish a definitive distance in which the police are permitted to search. Rather, the searchable area is that within which the arrestee might reach as "an extension of the body." In this instance the appellant was arrested ten feet away from where a firearm was located.

**CRIMINAL LAW – SEARCH, SEIZURE, AND ARREST – SUBJECTIVE OR OBJECTIVE TEST; OFFICER'S MOTIVE OR INTENT**

The reasonableness of a *Chimel* search does not depend on a police officer's subjective motivations. Rather, the inquiry is objective, and determined by asking whether a reasonable officer in those circumstances would have acted in a similar manner. In this case, for officer safety, it was reasonable for a police officer to have searched appellant's clothing because the police were arresting appellant on a warrant for a violent crime.

Circuit Court for Prince George's County
Case No: CT221299X

TYRON DEVON BORGES

v.

STATE OF MARYLAND
_____

Wells, C.J.,
Leahy,
Eyler, Deborah S.,
  (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Wells, C.J.
_____

Filed: August 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Appellant Tyron Devon Borges ("Borges") was asleep in his grandmother's bedroom when police entered her apartment to execute an arrest warrant against him for first- and second-degree assault. After placing him under arrest, a police officer picked up clothes from a nightstand to dress Borges. When the officer did so, he felt something heavy inside a jacket pocket. The officer searched the jacket and recovered a handgun. Borges was arrested and charged with possession of a regulated firearm after being convicted of a disqualifying crime and unlawful possession of ammunition.

Prior to trial, Borges moved to suppress the firearm, but the court denied his motion. Later, Borges entered a conditional guilty plea to preserve his right to challenge the suppression court's decision. The court sentenced him to five years' imprisonment with all but one year suspended, credit for time served, and five years of supervised probation. Borges timely appealed and asks whether the suppression court erred in denying Borges' motion to suppress evidence. For the reasons that follow, we affirm the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts were adduced at the suppression hearing. On March 30, 2022, an arrest warrant was issued for Borges for first- and second-degree assault, for allegedly physically assaulting his then-girlfriend and for malicious destruction of property. On the morning of April 7, 2022, at around 7:00 a.m., several Prince George's County deputies set out to arrest Borges. Borges was staying at his grandmother's apartment with his sister at the time. When the deputies arrived, Borges' sister let them into the apartment and directed them to the grandmother's bedroom where Borges was sleeping. Three deputies entered the bedroom, Deputy Sheriff Giovanni Romero ("Romero"), Sergeant Romanchick

("Romanchick"), and Deputy Sheriff Paul Perriello ("Perriello"). Deputy Sheriff Materka ("Materka") stood in the doorway.

Romero entered first and walked toward the bed, where Borges lay. The deputies instructed Borges to show his hands, get up, and stand next to the bed. Borges cooperated and was handcuffed. Perriello went to the other side of the bed from where Borges was standing and switched on the lamp located on the nightstand. The nightstand nearly touched the side of the bed. The deputies asked Borges about clothing because he was clad only in a t-shirt and long johns, and it was cold and rainy outside. Borges motioned his head toward the doorway and said to Perriello, "I've got pants over there[,]" and "I got stuff over there." A pile of men's clothing was on the nightstand. Perriello asked Borges "Is this your stuff?" Borges said "no." Perriello lifted the clothes from the nightstand. As Perriello later explained at the suppression hearing, because Borges was asleep in his grandmother's room, he "naturally went to the men's clothes" and assumed they were Borges'.

According to Perriello, as soon as he picked up the jacket and the other clothes, he felt something "heavy." He then set the jacket on the bed and searched it, finding a firearm inside the pocket. The deputies testified they check the pockets of any clothing they put on an arrestee to ensure there are no items that are prohibited from transporting with him to the correctional facility and to ensure officer safety.

While Perriello searched the clothing, Romero and Borges were about ten feet away from him. Borges did not move, reach for, or ask for the clothing. Eventually, the officers dressed Borges. Romanchick and Materka escorted Borges to the living room. Later, the

2

police charged Borges with possession of a regulated firearm after having been convicted of a disqualifying crime and unlawful possession of ammunition.

Before trial, Borges moved to suppress the firearm found in his jacket and the court convened a hearing. The State, relying on *Chimel v. California*, 395 U.S. 752 (1969), argued that the deputies did not exceed the scope of the original arrest warrant because the clothing where the police found the firearm was within Borges' immediate control. Borges conceded *Chimel*'s application but argued there was no legal basis to search beyond Borges' wingspan. He asserted that the gun was on the other side of the bed, ten feet away, and not within arm's reach. Additionally, Borges objected to wearing the clothes they tried to dress him in, stating it was a "search in search of a justification," there is no good intentions justification to the warrant requirement, and claiming it was cold outside does not establish probable cause to search. Further, Borges argued no other exception to the warrant requirement, including the plain view doctrine, applied, and nothing about the circumstances could have led a reasonable officer to believe they were in danger.

After hearing testimony from the police officers and counsels' arguments the court denied Borges' suppression motion. The court denied the motion, saying:

> I find that the arrest warrant was a legal arrest warrant. That when the officers arrived, the door was opened by a family member of the Defendant. She directed the officers to a bedroom and the testimony is that she said that that was her grandmother's bedroom, that he was in there.

> The Court notes that when the officers entered into the bedroom that the Defendant was there, lying in the bed. He was compliant, he showed his hands, he got out of the bed. He was shortly or immediately placed in handcuffs.

3

The officer testified that it was cold and rainy that night, they attempted to help him dress, as he was wearing night clothes. Officer Romero stated that Officer Perriello removed the clothing from the nightstand, put the clothing on the bed and at that time found a handgun in the clothing.

The Court notes that the nightstand was in close proximity of the bed, nearly touching the side of the bed. The Court could observe that the top drawer was open, I don't find that the officers opened a closed container and searched for the clothes. The clothes were draped over the top drawer and you could see clearly that the clothing was removed from the top drawer of the nightstand, outside of the nightstand, onto the bed.

Officer Perriello noted that it was clearly male clothing and knew they were in the grandmother's bedroom, this is clearly identified as male clothing. And when he lifted up the jacket, it was heavy. As a result of that he put it on the bed and then began to search, for officer safety, before they put the clothing on him.

The Court doesn't find that that was any unreasonable search and that they had effectuated an arrest. It was—the conditions outside warranted him not being—well, they could have just taken him outside with no shoes, no socks, in his underclothing, but were attempting to provide him with clothing. Again, the clothing was there in plain view, close proximity, almost touching the bed, on top of the nightstand.

I find it reasonable. When the officer lifted up the jacket, it felt heavy, put it on the bed, he searched and then found the gun and eventually some contraband. I don't find that the search was unreasonable, I don't find that it was unlawful.

The case moved forward to trial. However, Borges pleaded guilty to the charges in order to reserve his right to appeal the suppression court's decision. He was sentenced to five years' imprisonment with all but one year suspended, with credit for 271 days served, and five years of supervised probation. This timely appeal followed.

We will provide additional facts in our analysis when necessary.

**DISCUSSION**

## I.  Standard of Review

When reviewing a circuit court's denial of a motion to suppress evidence, we are "limited to the record developed at the suppression hearing." *Pacheco v. State*, 465 Md. 311, 319 (2019) (citing *Moats v. State*, 455 Md. 682, 694 (2017)). We assess the record and view the evidence "presented at the [suppression] hearing, along with any reasonable inferences drawable therefrom, in a light most favorable to the prevailing party." *Davis v. State,* 426 Md. 211, 219 (2012). "We accept the suppression court's first-level findings unless they are shown to be clearly erroneous." *Brown v. State*, 452 Md. 196, 208 (2017). We review *de novo*, however, and give no deference "to the question of whether, based on the facts, the trial court's decision was in accordance with the law." *Seal v. State,* 447 Md. 64, 70 (2016); *see also Norman v. State*, 452 Md. 373, 386 (2017). Where a party raises a constitutional challenge, "we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case." *State v. Johnson*, 458 Md. 519, 532-33 (2018) (quotation marks and citations omitted).

## II.  The Court Did Not Err In Denying the Motion to Suppress

### A. Parties' Contentions

Borges contends the warrantless search of his clothing, resulting in the discovery of the firearm, was unconstitutional and not within one of the narrow exceptions to the warrant requirement. Specifically, *first*, he argues the State failed to meet its burden of establishing that the warrantless search was reasonable. *Second,* he contends this was not a valid search

5

incident to arrest under *Chimel* because the area where the clothing and gun were located was not within the "*Chimel* perimeter," the area that may be fairly deemed an extension of the body. Additionally, Borges argues the facts do not support a theory that he posed a danger to the officers or had the means or intention of escaping. He contends the State's argument, that the police were justified in searching the pile of clothes because it was on the nightstand beside where Borges was sleeping immediately before he was arrested, is flawed and not supported by Maryland law. *Third*, Borges argues the search was not justified under the plain view doctrine, nor was it legal under any other exception to the warrant requirement, including the so-called "clothing exception," which has not been adopted in Maryland.

The State contends, *first*, that the court did not err in denying the motion to suppress because the evidence was discovered during a lawful search incident to arrest under *Chimel*. The State emphasizes that Maryland appellate courts have interpreted the "*Chimel* perimeter" to be the area that an arrestee "might" be able to reach or grab, and there is no bright line rule about the size of the *Chimel* perimeter. The State argues the handgun was within what Maryland's appellate courts have deemed to be the perimeter, considering Borges was sleeping right beside the clothes where the handgun was located only moments before he was arrested. The State contends the search legitimately arose because, at the time of the arrest, Borges was dressed in a t-shirt and underwear and the police needed to better clothe him to transport him because it was cold and raining outside. Because they were required to dress him, for their safety, the police had to search the clothing Borges

6

was about to wear. Finally, the State argued that because the jacket would have been ultimately within Borges' immediate control, it was within the *Chimel* perimeter.

*Second and alternately*, the State contends that if the search was not valid under *Chimel*, the police were permitted to search the clothing under the "clothing exception" to the warrant requirement. The State argues that appellate authority from other jurisdictions, which have adopted the clothing exception, is analogous to the facts here and is persuasive. Specifically, under the clothing exception exigent circumstances existed to search Borges' clothing because he was underdressed and needed to be dressed. Furthermore, the police did not use the fact that he needed to be dressed to move Borges around the bedroom to justify searching different areas within the room or any other clothing.

## B. Analysis

It is well settled that the Fourth Amendment to the United States Constitution prohibits 'unreasonable' searches and seizures. *Johnson*, 458 Md. at 533.[1] "Reasonableness" is "the ultimate measure of the constitutionality of a government search." *Pacheco*, 465 Md. at 320 (citing *Maryland v. King*, 569 U.S. 435, 447 (2013)). Whether a particular warrantless action on the part of the police is "reasonable" under the Fourth Amendment "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Id.* at 321

---

[1] This constitutional mandate is made applicable to the states through the Fourteenth Amendment. *Corbin v. State,* 428 Md. 488, 499 (2012); Article 26 of the Maryland Declaration of Rights also protects Maryland citizens against unreasonable searches and seizures. Because Borges has not made a separate argument based on Article 26, we will decide this case based solely on the federal constitutional analysis.

(quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Accordingly, "subject only to a few specifically established and well-delineated exceptions, a warrantless search or seizure that infringes upon the protected interests of an individual is presumptively unreasonable." *Grant v. State*, 449 Md. 1, 16-17 (2016).

One of the exceptions to the warrant requirement is a search incident to a valid arrest. The United States Supreme Court in *Chimel* emphasized "that [t]he scope of [a] search must be strictly tied to and justified by circumstances which rendered its initiation permissible." *Chimel,* 395 U.S. at 762 (internal quotations omitted). The Court also noted that a search incident to arrest allows the police to search the person of the arrestee and any area within his immediate control to protect themselves from danger and to prevent the destruction or concealment of evidence. *Id* at 762-63.[2] The rule authorizes searches of areas "within which [the arrestee] might gain possession of a weapon or destructible evidence." *Id.* at 763. "But these justifications are absent where a search is remote in time or place from the arrest." *Id.* at 764; *see also Carter v. State*, 236 Md. App. 456, 474

---

[2] "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel,* 395 U.S. at 762-63

(2018) (observing that "the search incident to arrest exception is applicable as long as the search is essentially contemporaneous with the arrest").

Maryland appellate courts have discussed and applied *Chimel*. Forty years ago, the Supreme Court of Maryland determined that "the rule developed in *Chimel* was based on an exigency rationale, that is, the safety of the officer and the preservation of evidence." *Stackhouse v. State*, 298 Md. 203, 211 (1983); *see also Rodriguez v. State*, 258 Md. App. 104, 116 (2023) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)) (This exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."). This Court, in interpreting *Chimel*, stated that:

> *Chimel* described the search incident zone as the area within the "reach, lunge or grasp" of the arrestee. It may also be thought of as the "wingspan" or "wingspread" of the arrestee. More and more these days, we use, as convenient shorthand, the "*Chimel* perimeter." All of these terms mean exactly the same thing. They describe the area in which the arrestee **MIGHT** be able to do either of the two bad things that the search incident exception was designed to prevent him from doing. That danger zone is *per se* the zone within which the police are permitted, nay encouraged, to take all necessary preemptive or preventive measures.

*Feaster v. State*, 206 Md. App. 202, 231 (2012) (emphasis in original). The search perimeter, this Court emphasized, is "pushed out to include a penumbral danger zone," which is the "area that may fairly be deemed an extension of the body." *Id.* at 231. And "[w]hen we map a particular *Chimel* perimeter, we measure outward from the epicenter of the arrestee." *Id.* at 240.

*First*, we address Borges' argument that the estimated "ten feet" between him and where the clothes were located is outside the *Chimel* perimeter. Borges is correct in that

9

"[t]he reach of the perimeter may ebb or flow with contributory circumstances," and "[o]ne size does . . . not fit all" regarding the *Chimel* perimeter. *Id.* at 238. Thus, we must examine the factual circumstances presented. Borges relies on *Foster v. State*, 297 Md. 191 (1983), *Lee v. State*, 311 Md. 642 (1988), *Feaster*, and *Stackhouse* to establish dissimilarities between the facts in those cases and those before us here. Borges' arguments are not persuasive.

In *Foster*, the appellant was arrested in a motel room for a murder that occurred during a robbery. 297 Md. at 217. When the officers arrived, they were aware Foster was previously involved in various serious, violent crimes, including robberies. *Id*. The arresting officer patted Foster down, handcuffed her behind her back, and searched the area immediately around her, including a partially open nightstand drawer that was a few feet away. *Id.* at 217-18. In the nightstand, the arresting officer saw a large amount of money and collected it as evidence. *Id.* at 218. Foster moved to suppress the evidence as a violation of the Fourth Amendment. *Id.* The Supreme Court of Maryland held that the search of the drawer incident to the arrest was reasonable under *Chimel*. *Id.* at 220. The Court reasoned that:

> [u]nder the circumstances here, it was reasonable for the arresting officer to search for a weapon in a partially open drawer located within two feet of the accused, even though she was then handcuffed. The fact that the accused was handcuffed necessarily restricted her freedom of movement and, consequently, the area within her reach, but did not necessarily eliminate the possibility of her gaining access to the contents of the nightstand's partially open top drawer. Indeed, the partially open top drawer of the nightstand—a natural place for a weapon to be hidden—remained an area of easy access for the accused, particularly if she had been able to break free of restraint.

*Id.* The Court further stated that "the arresting officer made no effort to search anywhere other than the area immediately around the accused." *Id.*

In *Lee*, the police received a tip that two men were bragging about participating in a robbery and a shooting during a pickup basketball game and that the firearm used was in one of their personal gym bags. 311 Md. at 649-50. Several officers went to the basketball court with guns drawn, forced Lee and the other individual to lie prone, and then patted them down. *Id.* at 651. One of the officers went to the gym bag hanging on the fence that was estimated to be from "a couple of feet up to eight feet" away. *Id.* at 651, 667. The bag felt heavy to the officer, and when he opened it, the firearm was found inside. *Id.* at 652. The officers arrested Lee for the robbery. *Id.*

The Supreme Court of Maryland held that the bag was within the *Chimel* perimeter, rendering the search valid under the Fourth Amendment. *Id.* at 670. The Court reasoned that "the area of immediate control under *Chimel* is determined by the potentiality for harm and not by actual, physical control by the arrestee at the time the search is conducted[,]" and *Chimel*'s concept of an area of control is "quite flexible." *Id.* at 670-71. Further, "[t]he seizure of [Lee] and the search of the gym bag were contemporaneous with the custodial arrest[,]" and "[t]he bag was subject to [Lee's] control when the seizure of their persons began and, however desperate or foolhardy it might have been for Lee . . . to lunge for the bag while [the officer] was holding it, it was physically possible for them to attempt to do so." *Id.* at 672.

Borges contends that, in both *Foster* and *Lee*, officers dealt with arrestees who were accused of violent gun charges. Arguably, they more clearly posed a danger to the officers

11

during those arrests. Additionally, the officers in both *Foster* and *Lee* only searched the immediate area around the arrestees, which was "a couple of feet." For those reasons, Borges argues, neither case is applicable. We disagree.

We note that the "immediate area" searched in *Lee* and *Foster* was not confined to a specific distance that would disqualify the estimated ten-foot distance here. Specifically, the distance between Lee and the evidence was estimated to be from a couple of feet up to eight feet, from where Lee was prone. *Lee*, 311 Md. at 667. Although the suppression court in this case made no factual finding about the actual distance between Borges and the clothes, the court determined the jacket was on a nightstand that touched the bed where Borges was sleeping. Furthermore, the deputies, without objection from Borges, testified that the distance was "about ten feet." And as far as we are concerned, ten feet and the eight feet in *Lee* are within a similar range when considering the *Chimel* perimeter, particularly where here the officers would have had to have unhandcuffed Borges to dress him. Had the officers not searched the jacket, the officers would have compromised their safety by putting Borges into even closer proximity to the handgun.

Moreover, in *Feaster*, this Court upheld the search of two bags that were approximately seven and sixteen feet away from the arrestee. 206 Md. App. at 212. In doing so, the court noted that "the [seven-]foot call was relatively easy" and "[a]rguably, the [sixteen-] foot call was pushing out the envelope a bit closer to its limits." *Id.* at 241. So, while we may have "winced" at sixteen feet, we ultimately found it acceptable. In this case, ten feet is much closer to the "relatively easy" call of seven feet.

12

Borges also relies on *Stackhouse* arguing that its holding "puts . . . to rest" the notion that the area of control "includes[s] the area of a person's control just before his arrest." *Stackhouse*, 298 Md. at 209. *Stackhouse* is unavailing because the facts there are markedly different from the facts here. In *Stackhouse*, the arrestee was hiding in an attic when the police arrived at his home to arrest him. 298 Md. at 207. The officers called Stackhouse out of the attic. He complied and was handcuffed in the second-floor hallway. *Id.* at 208. Then the officers went into the attic and discovered a shotgun buried in the insulation. *Id.* The Court held this search was not within the *Chimel* perimeter. *Id.* at 217. The Court reasoned that Stackhouse was taken out "of the attic and handcuffed; therefore, it cannot be argued that, from the floor below, the area of the attic was within his grasp." *Id.* at 218. In so holding, the Court rejected the State's expansion of *Chimel* under *New York v. Belton*, 453 U.S. 454 (1981) to include the area of a person's control just before his arrest. *Id.* at 209.

Here, by contrast, Borges was not removed from the room where the contraband was located. He simply stood on the other side of the bed from the nightstand, about ten feet away, which, as just discussed, we hold was within the *Chimel* perimeter. In contrast, Stackhouse was a floor away from where the police recovered the shotgun. That distance rendered the search outside the *Chimel* perimeter. Here, the suppression court did not expand *Chimel*, contrary to what Borges argues, because his area of control remained the same within the bedroom. This stands in contrast to what happened to Stackhouse who had been removed from the area where the contraband was located.

In considering further "contributory circumstances," we consider Borges' contention that because he was handcuffed and on the other side of the bed he would have needed to possess "the skills of an acrobat or Houdini" to cover the ten feet between him and the handgun. But we have consistently held that the arrestee being handcuffed or having obstacles between him, and the contraband does not negate an otherwise lawful search incident to arrest. *See Feaster,* 206 Md. App. at 237 ("As long as the arrest scene retains any potential of volatility, however, the courts, unwilling to risk a dead officer, will look on the arrestee as if he were Harry Houdini. The controversial calls almost invariably will go to the State."); *see also Foster,* 297 Md. at 219 (upholding the search incident to arrest after the arrestee was handcuffed because "even after an arrestee has been handcuffed there is a continuing potential for harm"); *Ricks v. State*, 82 Md. App. 369, 379 (1990), *aff'd*, 322 Md. 183 (1991) ("We note that the area deemed to be within an arrestee's reach, lunge or grasp is broad, and is not necessarily made any narrower by apparent obstacles inhibiting an arrestee's movement."); *Lee*, 311 Md. at 670 ("It is clear that the area of immediate control under *Chimel* is determined by the potentiality for harm and not by actual, physical control by the arrestee at the time the search is conducted.").

Under the circumstances, although Borges was handcuffed and there was a bed between him and the clothing, the holdings in *Feaster*, *Foster*, and *Lee* control. The situation here is not substantially different from those cases. Borges was handcuffed, as were the arrestees in *Feaster* and *Foster*, while the arrestee in *Lee* was forced to the ground and held by officers with their guns drawn. The bed, in this case, was a physical obstacle. But Borges was a potentially dangerous arrestee by virtue of the first-degree assault charge.

14

In situations like this, where officer safety is the concern, as we have noted, "[t]he controversial calls almost invariably will go to the State." *Feaster,* 206 Md. App. at 237. And, when observing a police officer's actions, "[t]he reasonableness of a search . . . 'does not depend on the officer's subjective motivations.'" *Brown v. State*, 261 Md. App. 83, 104 (2024) (quoting *Rodriquez*, 258 Md. App. at 123). Instead, "the inquiry is objective and '[w]e look to the record as a whole to determine what facts were known to the officer and then consider *whether a reasonable officer in those circumstances* would have'" acted in a similar manner. *Id.* (quoting *United States v. Edwards*, 769 F.3d 509, 516 (7th Cir. 2014) (emphasis in original)). Borges was being arrested for a violent offense. He had to be dressed to be transported. The officers found a handgun in the clothes that they would have had to unhandcuff Borges to dress. Under an objective standard of how a reasonable police officer would have acted, under the circumstances, we cannot conclude that the deputies' actions in this case were unreasonable.

III. **Because We Resolve this Appeal Based on *Chimel*, We Decline to Consider or Adopt the Clothing Exception**

Borges also asks us to consider the deputies' motivation for grabbing the clothing. Although the State argues we should adopt the clothing exception to the warrant requirement, we decline to do so because we have resolved the case based on *Chimel*. We, however, recognize the existence of the clothing exception to the warrant requirement which, as recognized in other jurisdictions, states that,

> an officer is authorized to take reasonable steps to address the safety of the arrestee and that the arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into the arrestee's home

15

to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant.

*United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000). While exigency is the overarching concern, courts rely on several factors when applying the clothing exception:

> (1) [The officer] was presented with an objective need to protect [the arrestee] against the substantial risk of injury to his feet and of chill in the absence of a shirt, (2) there was no evidence or even a claim that [the officer's] reasons for reentering the trailer were pretextual, (3) the intrusion into [the arrestee's] trailer was slight and temporary, particularly in light of the fact that the officers had only moments before lawfully been in the trailer to ensure the safety of [third parties] and had neither completed their business at the site nor left it, (4) the intrusion was strictly limited to the purpose of retrieving shoes and clothing, and (5) the purpose of the reentry and seizure of the boots was not to serve a governmental interest, but to ensure [the arrestee's] reasonable safety while he was in the government's custody.

*United States. v. Casper*, 34 F.Supp.3d 617, 623 (E.D. Va. 2014) (quoting *Gwinn*, 219 F.3d at 333-34). When invoking the clothing exception, "the government bears the burden of demonstrating particularly that the arrestee had a substantial need for the clothing and that the government's response was limited strictly to meeting that need." *Gwinn*, 219 F.3d. at 335. "Courts allow a clothing exception only when obtaining clothing will further the safety of the arrestee, not when the additional clothing simply 'complete[s] the arrestee's wardrobe.'" *Casper*, 34 F.Supp.3d at 623 (quoting *Gwinn*, 219 F.3d at 333).

We acknowledge the viability of the clothing exception as a legal theory. But we do not feel constrained to adopt it here because, as stated, the issue Borges poses on appeal may be resolved using a *Chimel* analysis.

### IV.   Conclusion

16

When reviewing the suppression court record, we assess the facts and reasonable inferences therefrom in the light most favorable to the prevailing party, the State here. *See Davis,* 426 Md. at 219. Under the circumstances, because the clothing, specifically the jacket that Borges was about to don was within the *Chimel* perimeter, a reasonable officer reasonably would have searched the clothing for officer safety. Although Borges contends the deputies ignored him when he directed them to clothing that was not on the nightstand, it was still reasonable for the deputies to believe the men's clothing on the nightstand belonged to Borges' because he was sleeping in his grandmother's bedroom.

We conclude there was no Fourth Amendment violation because the firearm was evidence discovered during a valid and reasonable search incident to arrest under *Chimel.* Therefore, we hold that the circuit court did not err in denying Borges' motion to suppress.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY ARE AFFIRMED. APPELLANT TO PAY THE COSTS.**